**RALLY'S, INC., Plaintiff,**

**v.**

**INTERNATIONAL SHORTSTOP, INC.; and Sampson, Inc., Delmar Shortstop, Inc., Gosslee & Associates, Inc., and Turner, Inc., Individually and d/b/a Shortstop of Arkansas, A Partnership, Defendants.**

Civ. No. LR–C–89–207.

United States District Court,
E.D. Arkansas, W.D.

Nov. 30, 1990.

**452**

Roger Glasgow, Little Rock, Ark., for plaintiff.

Gail K. Ponder, Barber Law Firm, Little Rock, Ark., for defendants.

## MEMORANDUM OPINION

ROY, District Judge.

This is a trade-dress infringement case involving two fast food restaurant chains, Rally's and International Shortstop, Inc. (Shortstop). Trial before the Court was conducted and post-trial briefs have been received. The Court therefore has the benefit of not only the extensive briefs presented by the parties, but also the testimony of the witnesses and numerous photographs of the stores in question.

Rally's and Shortstop are both fast food chains specializing in hamburgers. Both are double drive-through facilities. Rally's opened its first store in Jeffersonville, Indiana in 1985. Shortstop opened its first store in Austin, Texas in 1984, eighteen months before Rally's first opening. The Court will discuss the characteristics of each store separately.

The first Shortstop store was a light beige two-level building with double drive-through windows, red border around the bottom of the building and red tile awnings. The Shortstop sign was prominently displayed on the front of the building above the awning. Over the years, Shortstop has modified some of the appearance traits—converting the building to one level and using red vinyl backlit awnings—so as to make their stores more functional and acceptable to landlords and communities. As will be discussed later, much testimony was received as to why the modifications were made by Shortstop.

The first Rally's store consisted of a beige building with a red stripe (Rally's refers to this as a "ribbon of quality") circling the middle of the building, a red outside canopy and backlighting outlining the canopy at night. Rally's contends that it has established that its trade dress has emphasized the same distinctive features—the red, backlit, ribbed canopy, the red and cream color scheme, the graphics, and the building roof line outlined with white lighting—since 1985. It is contended that the use by Rally's and its franchisees of this trade dress has come to distinguish the products and services of Rally's and its franchisees from the products and services of other rapid service restaurants. Rally's believes that during the past two or three years, Shortstop Stores, particularly in North Little Rock, Arkansas, Shreveport, Louisiana, and Miami, Florida, have progressively come to resemble the Rally's look, to the point that many of them essentially duplicate the distinctive trade dress established by Rally's. The trade dress Rally's is seeking to protect is its building, the "total package" in which Rally's wraps the services and products it offers to a

mobile market of double drive-through hamburger patrons. This total package includes a light beige rectangular building with double drive-through windows, a wrap-around backlit red canopy or awning, and a red stripe around the building.

Rally's argues that the trade dress adopted by Shortstop is likely to be confused in the relevant market with Rally's trade dress; that its trade dress is nonfunctional; and that its trade dress has acquired secondary meaning. Rally's action for trade dress infringement arises under § 43(a) of the Lanham Act (15 U.S.C. § 1125(a)).

> Section 43(a) provides:
> Any person who shall ... use in connection with any goods or services ... a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such ... goods or services to enter into commerce, ... shall be liable to a civil action by any person ... who believes that he is or is likely to be damaged by the use of such false description or representation.[1]

The purpose of § 43(a) is "to protect both consumers and competitors against all forms of misdescription or misrepresentation of products and services ... (citation omitted)." *Gaston's White River Resort v. Rush*, 701 F.Supp. 1431, 1434 (W.D.Ark. 1988). It has been held that § 43(a) can be used to protect a restaurant's trade dress from confusingly similar imitations. *Prufrock, Ltd., Inc. v. Lasater*, 781 F.2d 129, 132 (8th Cir.1986).

> The trade dress of a product "involves the total image of a product and may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques." A restaurant's trade dress can include the shape and general appearance of the exterior of the restaurant, identifying sign, the interior floor plan, the appointments and decor items, the equipment used to serve the food, and the servers' uniforms. (citations omitted.)
> *Id.*

■ "The trade dress of a product is the total image of a product, the overall impression created, not the individual features." *Woodsmith Publishing Co. v. Meredith Corp.*, 904 F.2d 1244, 1247 (8th Cir.1990), citing *General Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 627 (8th Cir.1987). However, a party does not have a business interest capable of protection in the mere method and style of doing business. *Prufrock*, 781 F.2d at 131–132.

■ Rally's can obtain protection for its trade dress under the Lanham Act if its trade dress is primarily non-functional; has acquired a secondary meaning; and imitation of it would create a likelihood of confusion in consumers' minds as to the origin or source of the product. *Woodsmith, supra.* The Court finds that Rally's has failed to prove any of the above.

## FUNCTIONALITY

■ In the most recent Eighth Circuit case of *Woodsmith, supra*, the court set out in a footnote the test for determining whether a trade dress feature is functional:

> The test for determining whether a trade dress feature is functional is whether protection of the feature would hinder competition or impinge upon the rights of others to compete effectively in the sale of goods.
> *Woodsmith*, 904 F.2d at 1247, n. 6.

The court in *Prufrock, supra*, recognized that " '[t]he line between functionality and non-functionality is not * * * brightly drawn' and that some designs capable of protection under the Lanham Act may also perform a utilitarian function." *Prufrock*, 781 F.2d at 133.

Rally's states that it has no quarrel with any of the stores that Shortstop opened between March 1984 and December 1987, when the first allegedly infringing Shortstop store opened in El Paso, Texas. It is

---

1. As indicated by the plaintiff, § 43 was amended by the Trademark Law Revision Act of 1988, which became effective on November 16, 1989, after this case had been filed. Therefore, the matters in issue are governed by the provisions of former § 43(a).

only those stores built from December 1987 that Rally's contends are infringing. In considering the plaintiff's claim, the Court has considered those stores. However, in order to determine whether plaintiff has met its burden in proving the elements in a trade dress infringement case, at least with respect to functionality, the Court must examine pre-December 1987 Shortstops so as to understand the reasons subsequent modifications were made.

The photographs reflect that the first Shortstop stores were two-story buildings. However, Sam Talkington, President of Shortstop, testified that when they were building a store in Clearwater, Florida in 1986, they were required to build a building no more than 16 feet tall as opposed to the 26 or 27 foot tall building which they had been using. Other cities such as Beaumont and Dallas required the same, so that the store became a varying height, according to what they were allowed to build in shopping centers. This feature was controlled by the shopping center owners.

As to the use of the awnings generally, Sam Talkington, Michael McMullan, Shortstop franchisee in south Florida, and Mike Salvage of the Shreveport franchise testified that the awnings were used to protect customers from the elements. Jay Darling, former President of Burger King and an expert on industry standards for the fast food business, testified that awnings are used for any of three reasons: (1) to shelter customers from the elements; (2) to provide greater visibility; or (3) to draw attention to a sign.

Mr. Talkington stated that the awnings in the early stores were extremely high off the ground so that when it rained the water would fall back in toward the building and fall onto the cars. When the height of the building was lowered, the lower awnings served a better purpose.

Mr. Talkington testified that the red tile awnings were changed to red vinyl in 1986 because the sun baked the tiles to such a degree that they had to be painted twice a year. Vinyl was more durable.

Shortstop began using backlighting for its awnings in July 1986, although Mr. Talkington stated that their earlier stores had fluorescent tubing all the way around their buildings. Wayne Albitron, Executive Vice–President of Operations for Rally's, testified that the first time that backlighting was used for Rally's awnings was August of 1986, although the canopies had been illuminated up to that time. Jay Darling testified that he couldn't recall seeing backlit awnings 10 years ago. He said that there were awnings then and lights under the awnings, but that the state of the art in terms of translucent material has really only come into its own in the last six or seven years. Only then you could have something that gave protection that was long lasting enough and was translucent so that it could serve several purposes—protection and a base for signage.

Shortstop also uses the color red on its building—a red border around the building, as well as red awnings. Jay Darling testified that red is a common color in the fast food industry in part because red means hot, which is an attribute in selling a hot hamburger, and because it provides excellent visibility from the highway.

As to the color of light beige used on the building, Jay Darling testified that beige or creamy white is a common building color, and has especially been in the last five to ten years, because it helps accent the building and gives a focal point for signage. He also stated that a company gets much less resistance with natural products or with non-offensive colors since those colors blend in better with the rest of most communities. Mr. Darling testified that the rectangular shape of double drive-through restaurants such as Rally's and Shortstop is dictated by the function and purpose of the building, and that building height is governed by the need for visibility and acceptability to municipalities.

There is no question in the Court's opinion that most of the individual features Rally's seeks to protect are functional. A review of the many photographs of Shortstop, Rally's and other fast food restaurants indicates that the colors red and light beige are commonly used as well as red awnings. Even more significant is the fact

that red is a color which represents "hot" and "stop"; light beige is a non-offensive color used frequently to comply with municipal requirements; awnings are used to protect customers from the elements, and backlighting of the awnings is used to enhance visibility.

It is Rally's position that it is seeking to protect a "total package" that includes its arrangement and combination of its colors, awnings, and lighting, not the separate parts. Rally's argues that while each of these three features—cream-colored buildings, red accents, and rooflines outlined with lights—may be features that are "common" components to other restaurants' trade dress, Shortstop's evidence failed to establish that they are used by any other restaurants in the same way that Rally's has combined them to create its own look.

The Court disagrees with Rally's statement that Shortstop failed to establish other restaurants used the combination Rally's seeks to protect. Although it is more appropriate to discuss this when discussing secondary meaning, the Court is of the opinion that Shortstop presented numerous photographs of other restaurants using "packaging" similar to Rally's.

The Court does agree that some elements of the Rally's look are unique and non-functional, such as the Rally's sign and "hamburger man" logo and possibly the red stripe around the middle of the building, which Rally's refers to as its ribbon of quality. Shortstop does not utilize these features. Instead, it prominently displays its own sign and name and now uses a peak or pointed roof on the front of the building. Furthermore, Shortstop has a red border at the bottom of the building which has been used since its first store opened in 1984.

Even considering the "total package" that Rally's is seeking to protect, the Court finds that the total package is functional.

SECONDARY MEANING

█ Even if the Court were to hold otherwise, Rally's has not presented sufficient evidence to establish that its trade dress has a secondary meaning in the Little Rock, Shreveport and Miami areas (i.e.,

that the public has come to recognize the trade dress as associated with the plaintiff's product). *Woodsmith*, 904 F.2d at 1247.

The Eighth Circuit, in *Truck Equipment Service Co. v. Fruehauf Corp.*, 536 F.2d 1210 (8th Cir.1976), *cert. denied*, 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976), ("TESCO"), set out the necessary elements to establish secondary meaning:

"[A] name, mark, or symbol by long and exclusive use and advertising by one person in the sale of his goods * * * may become so associated in the public mind with such goods * * * that it serves to identify them and distinguish them from the goods * * * of others. When such an association exists, the name, mark, or symbol is said to have acquired a 'secondary meaning,' in which the original user has a property right which equity will protect against unfair appropriation by a competitor." * * * "A trademark or a trade name may have acquired a secondary meaning in one locality but lack such a meaning in another."

*Id.* 536 F.2d at 1219.

Rally's must thus establish that whenever Little Rock, Shreveport or Miami area consumers saw a beige double drive-through restaurant with reddish or burgundy backlit awnings, they immediately recognized such as a Rally's restaurant. "[T]he ultimate inquiry is whether in the consumer's mind the mark denotes a 'single thing coming from a single source.'" *Co–Rect Products, Inc. v. Marvy! Advertising Photography, Inc.*, 780 F.2d 1324, 1330 (8th Cir.1985).

Among the factors Rally's presents as requiring a finding of secondary meaning are: other infringements of Rally's trade dress; Rally's growth; media attention; Rally's advertising; Rally's exclusive use of its trade dress; Shortstop's knowledge; and actual confusion.

Rally's reliance on media attention is not persuasive evidence of secondary meaning, particularly in light of the similar media attention given to Shortstop. Interestingly, in an article printed about Shortstop in

the July/August, 1985 issue of Texas Food & Service News, the author states:

> Shortstop managers shoo away 15 to 20 people a week who try to "sneak" photographs of the stores.

As to Rally's advertising, the Court received testimony about Rally's advertising and its costs. The Court also viewed videotapes of advertising commercials developed by Rally's. Shortstop objected to the testimony of Doug Gibson, Rally's advertising agent, regarding advertising costs since he did not address the geographical areas involved in this litigation nor the time prior to when Shortstop began using the trade dress. The Court finds this to be of no consequence in this case. After reviewing the advertisements, the Court is of the opinion that it is not the building or "total package" that is the focus of the advertisements, but rather it is the sign, the speed of service and the inexpensive nature of items served that is the focus. In the 1987 Rally's television commercial, the building is depicted only briefly. In the 1989 television commercial which was produced after this lawsuit was filed, the building was only depicted briefly at the very beginning of the tape with two quick shots—one of the front and one of the side. Again, the focus of the ad was not on the building but was on the quick service and inexpensive items.

Another television commercial was shown that was also produced in 1989, depicting the store at night. Once again, the building was shown only briefly—the emphasis in the video was not the building. The Court does not believe Rally's advertising is sufficient to establish secondary meaning.

■ As to evidence of other infringements, Wayne Albriton testified that Shortstop was not the first Rally's competitor to attempt to pirate its trade dress. He identified photographs of Scooters, a chain against which Rally's sought, and received, an injunction. Rally's contends that attempts by third parties to plagiarize Rally's trade dress are evidence of secondary meaning. *See Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 77 (2d Cir.1988). A review of the photographs submitted shows that stores such as "P.D. Quix," "Dakker's," "Hot Shots," "Sonic," "Popeyes," "Gabes" all use combinations of what Rally's considers its trade dress, some of which resemble Rally's more than Shortstop. However, a review of the Rally's stores indicates that there are variations among even the Rally's stores themselves. The Rally's store in Albuquerque, New Mexico has the Rally's sign placed on the sides and front of the awning. There are glass tiles at the front of the store. No black ribbing appears on the awning. The Rally's in McAllen, Texas only has the sign at the front of the building; the front doors and windows are red tile, and there is black ribbing on the awning. The Rally's in San Antonio, Texas is an oblong-shaped building and the red stripe does not go all the way around the building. In the Rally's in Phoenix, Arizona, there is red tile roofing similar to that which was originally used by Shortstop above the red backlit awning. It is obvious that Rally's has not even used the features it claims to be protected as a "total package" in the same way in its own stores. Therefore, the Court cannot say that Shortstop pirated Rally's trade dress since Rally's has not even used this "total package" consistently. Furthermore, as stated by the Court in *TESCO, supra*, the name, mark, or symbol is to be by "long and exclusive use." Rally's has failed to show that it has used the "total package" exclusively for any significant length of time.

The Court recognizes that the Rally's and Shortstop stores are somewhat similar in building size, shape and color scheme, just as are a number of other restaurants in the fast food hamburger category. It is the signs and logos that clearly distinguish them.

Based upon the above, the Court finds that Rally's has failed to establish that its trade dress has secondary meaning.

## LIKELIHOOD OF CONFUSION

■ Finally, the Court finds that Rally's failed to establish that imitation of Rally's trade dress would create a likelihood of confusion. The court in *Gaston's White*

*River Resort v. Rush,* 701 F.Supp. 1431 (W.D.Ark.1988) set out seven factual considerations given by the Eighth Circuit in *General Mills v. Kellogg Co.,* 824 F.2d 622 (8th Cir.1987), in determining likelihood of confusion: (a) strength of owner's mark; (b) proximity of the goods or services offered; (c) similarity of the marks; (d) evidence of actual confusion; (e) marketing channels used; (f) type of services and the degree of care likely to be exercised by the consumer, (g) the defendant's intent; and (h) the likelihood of expansion. *Gaston's,* 701 F.Supp. at 1436.

Rally's argues that evidence of actual customer confusion is substantial evidence of the likelihood of confusion required to establish infringement, citing *Fotomat Corp. v. Cochran,* 437 F.Supp. 1231, 1244 (D.Kan.1977), and that the testimony presented indicates actual confusion. However, the primary evidence of confusion came from the testimony of Mike Pierce, Rally's Little Rock franchisee, that customers brought in Shortstop's coupons to the Rally's store on Camp Robinson Road and that some customers entered the Rally's store the wrong way. There is no evidence this reaction was because of the confusing similarity of the two buildings and it is equally possible that the confusion was caused because of two new restaurants opening at approximately the same time when the public was familiar with neither. Joe Rider, a Rally's franchisee in Shreveport, described customers appearing at his store on the morning of a remote radio broadcast from a Shortstop store in Shreveport, expecting to be served the Shortstop breakfast advertised on the radio broadcast, although Rally's does not serve breakfast and was not participating in a remote radio broadcast. Rider also testified about a telephone complaint that the Rally's in Shreveport's Pierre Bossier Mall used too much mustard on its hamburgers. Rally's is not located at the Pierre Bossier Mall but Shortstop is. No testimony was presented by the customers themselves to support plaintiff's theory. In fact, Rally's did not present one customer who testified that he was confused by any similarity of appearance of Rally's and Shortstop stores.

Jay Darling testified that there is always some amount of confusion among consumers wherein they attribute traits of one restaurant to another. Furthermore, restaurants often accept competitor coupons.

With respect to proximity of goods and services offered, Shortstop states that although Rally's and Shortstop restaurants are relatively close to one another, Shortstop was located in Shreveport, Louisiana, Tampa, Florida and central Arkansas prior to Rally's. Rally's responds by arguing that Rally's had a national expansion plan in place from the time it opened its first store in September 1985, and that any Shortstop stores opened in the three metropolitan areas in question before Rally's arrived did not feature the Rally's trade dress. Rally's position assumes that Shortstop's subsequent stores did feature the Rally's trade dress. In light of this Court's previous finding to the contrary, and based upon the credible reasons given for Shortstop's subsequent modifications, Rally's position is unpersuasive.

■ When considering the similarity of the marks, it is the Court's opinion that the features of Rally's and Shortstop which are similar—color schemes, red or burgundy backlit awnings; double drive-throughs—are not distinctive to Rally's but are common and used by many. The features which are distinctive—name, sign (including placement of the sign relative to the front awning), Rally's hamburger man logo, awning shape and presence or absence of black ribbing, Shortstop's peaked roof, Rally's "ribbon of quality" stripe—are not similar.

As to the type of services and degree of care exercised by the consumer, Jay Darling testified that location is the primary factor in establishing the success of a fast food hamburger restaurant. Research conducted by him indicated that 70% of fast food users will not travel more than three miles. Thus, such customers are going to be familiar with the location and appearance of restaurants in their area and will not likely be confused or have to make their decision on where to stop based on

**458**

whether they happen to see a building exhibiting certain appearance traits.

■ As to Shortstop's intent in choosing the particular packaging, the Court is persuaded that the modifications made by Shortstop after its first opening were not to trade on Rally's good reputation, but rather were justified by the needs and demands of the business, the communities and the customers. Furthermore, Sam Talkington testified that he had his own ideas and has continued to use them since 1984. He stated that he thinks he first saw a Rally's in 1987 or 1988. In addition, Talkington testified that included among his most profitable stores are those featuring the taller building with a tile awning— those used in 1984. The Court finds Mr. Talkington's testimony to be credible.

In conclusion, after considering all of the evidence presented, for the reasons given above, the Court finds that Rally's failed to satisfy its burden of proving that it had a protectible trade dress. Therefore, judgment will be entered in favor of defendant Shortstop.

IT IS SO ORDERED.