GODDARD, INC. d/b/a Freshway
Food Systems, Plaintiff,

v.

HENRY'S FOODS, INC., Defendant.

No. CIV. 01–1478RLE.

United States District Court,
D. Minnesota.

Sept. 26, 2003.

1022

Joseph John Roby, Jr., Johnson Killen & Seiler, Duluth, MN, Richard L. Travis, Mark J. Arndt, May & Johnson, Sioux Falls, SD, for plaintiff.

Warrenn C. Anderson, Amy J. Doll, Fluegel Helseth McLaughlin Anderson & Brutlag, Morris, MN, for defendant.

## ORDER

ERICKSON, United States Magistrate Judge.

### I. *Introduction*

This matter came before the undersigned United States Magistrate Judge, pursuant to the consent of the parties, as authorized by Title 28 U.S.C. § 636(c), upon the Motions of the Defendant, Henry's Foods, Inc. ("Henry's"), to Enforce Settlement, and for partial Summary Judgment.[1] A Hearing on the Motion to Enforce Settlement was conducted on February 6, 2003, and a Hearing on the Motion for partial Summary Judgment was conducted on June 12, 2003. At both Hearings, the Plaintiff, Goddard, Inc., d/b/a Freshway Food Systems, ("Freshway"), appeared by Mark J. Arndt, Esq., and Henry's appeared by Amy J. Doll, Esq.

For reasons which follow, we deny Henry's Motion to Enforce Settlement, we grant Henry's Motion for partial Summary Judgment, and we decline Henry's request that we dismiss, without prejudice, Freshway's remaining State law claims, as an exercise of our supplemental jurisdiction.

### II. *Factual and Procedural History.*

Since 1992, Freshway has operated a deli-style food service, through which it sells items such as deli-style sandwiches, salads, pizza, and chicken. See, *Second Affidavit of Joan Goddard in Support of Motion for Preliminary Injunction,* at ¶¶ 7–8 ("Goddard Aff.").[2] The food goods

---

1. The Plaintiff had also filed a Motion to Compel Discovery, which was heard, and decided, on February 6, 2003. We ruled, from the Bench, as to each of the Plaintiff's four discovery requests and, while we ordinarily issue an Order to memorialize our rulings, we did not do so in this instance and, since neither party requested additional assistance from the Court as to those issues, a formal Minute Order proved unnecessary.

2. As we have previously addressed, in great detail, the facts of the case in the context of the Plaintiff's Motion for a Preliminary Injunction, neither party reiterated the relevant facts in their respective briefing of the pending Summary Judgment Motion. According-

are packaged, and sold, under the Federal service mark "Freshway Food Systems." *Id.* at ¶ 8. Freshway currently maintains ninety-two food centers, which are primarily located in convenience stores throughout the upper Midwest, including twenty-three such stores in Minnesota. *Id.* at ¶¶ 9–10. Fresh-way franchises are purchased by local owners, most of whom are also convenience store owners and operators. *Id.* at ¶ 11. Prior to May of 2001, Freshway was a licensor, rather than a franchisor. *Transcript of Evidentiary Hearing of May 8, 2002,* at 37 ("Tr. 37").

In contrast, Henry's is a grocery and food service distributor. See, *Affidavit of Terry Loeffler,* at ¶ 2, *Ex. 32 to Henry's Memorandum of Law in Opposition to Freshway's Motion for a Preliminary Injunction* ("Loeffler Aff."). Since 1928, Henry's has supplied retail outlets with products, such as cigarettes, candy, paper products, and snacks, most of which were designed for resale. *Id.* Since 1987, Henry's has also been supplying its customers—including convenience stores, restaurants, drive-ins and taverns—with frozen, refrigerated, and dry groceries, which can be prepared in-store. *Id.*

In the mid–1990's, Henry's considered developing its own food service program for convenience stores but, after determining that the market was saturated, elected to remain in the distribution business. *Id.* at ¶ 3. In 1997, Henry's began delivering Freshway's food products to Freshway's licensed distributors. See, *Goddard Aff.,* at ¶ 14. As a result of that relationship, Henry's was provided with copies of Freshway's operations and sales manuals, and Henry's personnel attended Freshway's employee training sessions. *Id.* at ¶ 16. Henry's maintains that, during the first two years of its relationship with

Freshway, it heard frequent complaints about the quality, and service, provided by Freshway, as well as about the high prices of franchising, and branded concepts, generally. See, *Loeffler Aff.,* at ¶ 3. Accordingly, in 1999, after a disagreement broke out between the parties, concerning the scope of their distribution agreement, Henry's initiated its Deli Max program ("Deli Max"), through which it offered pizzas, submarine and other sandwiches, salads, soups, chicken products, and bakery goods, that owners could prepare in their stores, and sell as retail food service items. *Id.* A number of Freshway's licensees changed to the Deli–Max program, at that time. *Id.*

In November of 1999, due, in part, to Henry's foray into the retail food service business, Freshway terminated its distribution agreement with Henry's. See, *Goddard Aff.,* at ¶ 17. Between February of 2000, and June of 2001, eight of Freshway's distributors/ licensees terminated their relationship with Freshway, and began operating Deli Max stores. See, *Loeffler Aff.,* at ¶ 11. All eight of those licensees were convenience stores, which were located in Minnesota, and which had all been serviced by Henry's, during the period in which Henry's was operating as Freshway's food service distributor.

This litigation arises out of the Plaintiff's claim that, "[w]ith the exception of changing the name from Freshway to [Deli-Max], the appearance of the eight stores that were converted to [Deli–Max] remained nearly identical to the stores' appearances when they were Freshway locations." *Goddard Aff.,* at ¶ 24. Fresh-way also complains that the Deli Max program utilizes the same four main menu items, menus which are substantially similar in

ly, we have drawn our factual recital from our previous Order, and have, therefore, cited to the documents, referenced in that earlier Or-

der, as supplemented by the parties' more recent submissions.

look, name, price, and content, nearly identical ingredient labels, nearly identical profit analysis techniques, and substantially similar "Frequent buyer club" punch cards, as does Freshway. *Id.* at ¶ 25. As a result, arguing that Henry's purposefully copied the Freshway look, and concept, when it initiated its Deli Max program in the referenced eight stores, Freshway commenced this litigation, asserting claims of false representations and false designation of origin; Federal trademark/service mark infringement; Federal common law service mark infringement; Federal common law unfair competition; deceptive trade practices, in violation of Minnesota State law; State trademark infringement; State common law unfair competition; breach of contract; and conversion.

### III. *Discussion*

Since a finding, that the parties had reached an enforceable settlement, would obviate any need to consider Henry's Motion for Summary Judgment, we commence our analysis with a consideration of Henry's Motion to Enforce Settlement.

### A. *Henry's Motion to Enforce Settlement.*

While litigating their respective claims and defenses, the parties engaged in settlement negotiations, which started with Freshway's offer to settle the case, in a letter dated August 22, 2002, in which counsel for Freshway stated:

> Pursuant to my phone conversation with you last week, we are forwarding an offer of settlement. Our client is willing to release Henry's Foods from all claims made in its Complaint, proposed Amended Complaint, and Motion for Preliminary Injunctive Relief currently pending in front of the Court in exchange for $50,000.00.

See, *Exhibit A attached to Henry's Memorandum of Law in Support of Motion to Enforce Settlement* ("Henry's Brief").

By letter dated October 4, 2002, defense counsel rejected that offer, on behalf of his client, stating, in part, that Henry's was "unwilling to offer any money," and was, instead, planning to move forward with its Motion for Summary Judgment. *Exhibit B to Henry's Brief.* Through counsel, Henry's further related that it was planning to include Freshway's breach of contract claim in its Motion for Summary Judgment, as it did not believe that there was any evidence that its contract, which Freshway claimed was breached, had ever been effected.

In response, in a letter dated November 1, 2002, Freshway transmitted, to Henry's, the documents which it believed supported its breach of contract claim, and related that it was continuing to gather other documents which would "support the value" of that claim, and would forward those documents when they were available. *Exhibit C to Henry's Brief.* Freshway represented that a "previous internal audit indicated the value of that contract claim was in excess of $10,000." *Id.* In addition, the letter advised that Freshway was "prepared to discuss a dismissal of the trade dress claims upon a resolution to the breach of contract claim," and asked Henry's counsel to contact Freshway's counsel if it had any interest in that proposal. *Id.*

Henry's responded by letter dated December 9, 2002. See, *Exhibit D to Henry's Brief.* Henry's first commented on the documents that had been produced by Freshway, on the proposed breach of contract issue, and thereafter, addressed the concept of a settlement. As to settlement, the letter stated:

> My client feels very strongly it has not breached any agreement with Freshway and certainly never shorted Freshway on any rebates. For this reason, my client is unwilling to pay your demand of $10,000 to settle this case but will offer

$3,000 to settle this matter along the lines of the enclosed Stipulation.

*Id.*

In addition to the proposed Settlement Agreement, Henry's also appended, to its letter, a Stipulation of Dismissal with Prejudice for Freshway's review.

Freshway responded on December 20, 2002, stating that Henry's "offer to settle this matter for a payment of $3,000.00 under the terms set forth in [the Defendant's] December 9, 2002 letter is rejected." *Exhibit E to Henry's Brief.* After discussing a number of on-going discovery disputes between the parties, Freshway returned to the issue of settlement, and stated that it agreed that "it may be in both parties' interest to resolve this matter without incurring additional legal expenses," but that, until Freshway received certain other discovery from Henry's, it could not "place a value on" its claim. *Id.* Freshway also related that it did not anticipate dismissing its trade dress claim without being fully compensated for the alleged breach of contract.

Henry's response was contained in a letter dated December 30, 2002. While no settlement proposal was made in the letter, Henry's counsel asked that, after reviewing the contents of that letter, Freshway contact counsel, in order to "give one last shot at trying to negotiate something here." *Exhibit F to Henry's Brief.* Fresh-way responded on January 3, 2003, and expressed its desire to settle, stating as follows:

> [W]e obviously disagree with your sentiment that the breach of contract claim does not amount to "all that much money either." The ten thousand dollar figure suggested a few months ago was a very conservative estimate and a good-faith attempt at settlement by my client. Until we receive our discovery requests

* * * we are unwilling to reduce our demand.

*Exhibit G to Henry's Brief.*

Freshway further advised that it was planning to move forward with its Motion to Compel, in order to obtain the referenced discovery.

Apparently, after that letter, counsel for the parties conversed by telephone, and discussed settlement. Thereafter, Henry's attorney wrote, as follows, to Freshway's counsel:

> Pursuant to our telephone conversation of Monday [January 6, 2003], I enclose [this] Settlement Agreement incorporating our commitment of $10,000 to settle this matter. Please review and follow-up with any drafting concerns.

*Exhibit H to Henry's Brief.*

Attached to the letter was the same Stipulation Agreement that Henry's had attached to its settlement proposal of December 9, 2002, but modified only to reflect a settlement offer of $10,000.00. See, *Exhibit I to Henry's Brief.* Thereafter, on January 16, 2003, the parties' attorneys again spoke by telephone. A letter, memorializing that conversation, was sent by Freshway, to Henry's, on January 17, 2003, and stated as follows:

> Pursuant to our telephone conversation yesterday, please be advised that my client has agreed to accept your settlement proposal of $10,000.00 pursuant to your January 7, 2003 correspondence and proposed Settlement Agreement and Release on the condition that your client agree to one additional term of settlement.
>
> We propose the additional term of settlement be incorporated in the Settlement Agreement and Release and state the following:
>
> > Plaintiff and Defendant agree that for a period of one year (365 days), follow-

ing the termination, discontinuation or removal for any reason, of a Freshway Food Service System from a particular location, the same location will not be occupied by a Henry's Foods, Inc. food service program, including but not limited to, a "Deli Max" franchise. This provision should not be construed to limit Henry's Foods, Inc. ability to provide wholesale supplies, including food supplies, to any party.

*Exhibit J to Henry's Brief.*

Henry's rejected that proposal on the ground that the parties had reached a complete settlement on January 6, 2003, such that the Freshway could not add a new, material, term to that agreement. For its part, Freshway maintains that it never accepted the Defendant's offer to settle at $10,000, since the terms in the proposed Settlement Agreement and Release, which had been drafted by Henry's were not acceptable to Freshway. Instead, Freshway argues that it rejected that offer, and made a counteroffer, which contained a new, material term—the non-competition clause. Thereafter, Henry's filed its Motion to Enforce the Settlement which, Henry's submits, was reached on January 6, 2003.

■ 1. *Standard of Review.* Under Minnesota law,[3] "[t]o constitute a full and enforceable settlement agreement, all the essential terms must be agreed upon." *Transclean Corp. v. Motorvac Technologies, Inc.,* supra at *8, citing *Ryan v. Ryan,* 292 Minn. 52, 193 N.W.2d 295, 297 (1971); *Jallen v. Agre,* 264 Minn. 369, 119 N.W.2d 739, 743 (1963). Only those terms upon which the settlement hinges are to be considered material terms. See, *Sheng v. Starkey Laboratories, Inc.,* 117 F.3d 1081, 1083 (8th Cir.1997). Accordingly, "[t]he fact that the parties left some details for counsel to work out during later negotiations cannot be used to abrogate an otherwise valid agreement." *Id.,* citing *Worthy v. McKesson Corp.,* 756 F.2d 1370, 1373 (8th Cir.1985)(per curiam); see also *Transclean Corp. v. Motorvac Technologies, Inc.,* supra at *8; *Trnka v. Elanco Prods. Co.,* 709 F.2d 1223, 1226 n. 2 (8th Cir.1983). The question of whether a particular term is material, "is a legal determination for the Court." *Transclean Corp. v. Motorvac Technologies, Inc.,* supra at *8.

2. *Legal Analysis.* Here, since the parties dispute the existence, and terms, of a settlement agreement, they have been afforded an Evidentiary Hearing. See, *Sheng v. Starkey Laboratories, Inc.,* 53 F.3d 192, 194 (8th Cir.1995). Given the Record presented, and the governing principles of Minnesota contract law, we find that no accord was reached by the parties and that, as a consequence, no settlement can be enforced.

■ "A settlement agreement is essentially a contract, subject to contractual rules of interpretation and enforcement." *Ridgecliffe Second Association v. Boutelle,* 2001 WL 1182404, at *2 (Minn.App., October 9, 2001), citing *Theis v. Theis,* 271 Minn. 199, 135 N.W.2d 740, 744 (1965). It is axiomatic that, in order to have a valid contract, there must be an offer, acceptance, and valid consideration, *S O Designs USA, Inc. v. Rollerblade, Inc.,* 620 N.W.2d 48, 53 (Minn.App.2000), rev. denied (Minn., February 21, 2001), and also a meeting of the minds as to the material terms of the contract. *Minneapolis Cablesystems v. City of Minneapolis,* 299 N.W.2d 121, 122 (Minn.1980). " '[W]here the offer is clear, definite, and explicit, and leaves nothing open for negotiation, it constitutes an offer, [the] acceptance of which will complete

---

**3.** Both parties agree that Minnesota law governs this issue, as do we. See, *Transclean Corp. v. Motorvac Technologies, Inc.,* 2002 WL 31185886 at *4 (D.Minn., September 30, 2002).

the contract.'" *Short v. Sun Newspapers, Inc.,* 300 N.W.2d 781, 786 (Minn.1980), quoting *Lefkowitz v. Great Minneapolis Surplus Store, Inc.,* 251 Minn. 188, 86 N.W.2d 689, 691 (1957). As to that acceptance, the Minnesota Supreme Court "has stated that * * * '[a]n acceptance, to be valid and to give rise to a binding contract, must be made in unequivocal and positive terms which comply exactly with the requirements of the offer.'" *Lund Industries, Inc. v. Wonder Industries, Inc.,* 2002 WL 1327012, at *4 n. 2 (Minn.App., June 18, 2002), quoting *Minar v. Skoog,* 235 Minn. 262, 50 N.W.2d 300, 302 (1951). "If the acceptance seeks to vary, add to, or qualify the terms of the offer, it is not positive and unequivocal, and constitutes a rejection of the offer and a counteroffer." *Minar v. Skoog,* supra at 302; *Abrahamson v. Abrahamson,* 613 N.W.2d 418, 423 (Minn.App.2000)("If the acceptance varies, it constitutes a counteroffer, which the original optionee may accept or reject," and "[a] counteroffer does not give rise to a completed contract until accepted."), citing *Markmann v. H.A. Bruntjen Co.,* 249 Minn. 281, 81 N.W.2d 858, 862 (1957).

■ Our conclusion that, under the circumstances presented, no contract was formed, turns largely on the absence of any showing, by the parties, as to the content of the telephonic negotiations between the parties' attorneys and, particularly, the one which occurred on January 6, 2003, during which, according to Henry's, a settlement was reached. In the absence of any evidence as to the content of that conversation, we are left to consider only the evidence which is now before us. Based on that evidence, we conclude that no agreement was reached.

First, we note that, in the letter of January 17, 2003, from Freshway to Henry's, Freshway refers to Henry's having made a "settlement proposal" in its communication of January 7, 2003. While Freshway's characterization of that letter is not binding on the Court, we are provided with some evidence to reflect that no accord was actually reached in the telephone conference of January 6, 2003. However, just as we are unable to credit Henry's assertion, that its letter of January 7, 2003, memorialized a settlement agreement which had been reached on January 6, 2003—absent any showing of the content of that conversation—we also cannot credit Freshway's assertion that those conversations closed with an offer from Henry. Instead, we are compelled to limit our focus to the evidence that is competently before us. We conclude, based upon that evidence, that Henry's purported acceptance, on January 7, 2003, was materially different from the last offer made by Freshway—on January 3, 2003—and accordingly, we find that a complete accord was not then reached.

The material difference, between the parties' respective offers and acceptances, rests in the scope of the claims which the parties contemplated would be settled, by Henry's payment of $10,000. We find that Freshway's offer was solely to settle its breach of contract claim, and to agree to negotiate the dismissal of its trade dress claim, while Henry's contemplated that its payment would dispose of both the breach of contract, and the trade dress claims, as is evidenced by the Settlement Agreement and Release, and the Stipulation of Dismissal with Prejudice, which are attached to Henry's letter of January 7, 2003.

We reach this conclusion after a close review of Freshway's letters, to Henry's, of November 1, 2002, and January 3, 2003. In its letter of January 3, 2003, Freshway responded to Henry's suggestion that the parties "give one last shot at trying to negotiate" a settlement. *Exhibit G to Henry's Brief.* Freshway starts by stating that it is interested in resolving the

litigation, but that it "disagree[s] with [Henry's] sentiment that the breach of contract claim does not amount to 'all that much money either,'" as Henry's had stated in its letter of December 30, 2002. *Id.* Fresh-way then continues by expressing a belief that "[t]he ten thousand dollar figure suggested a few months ago was a very conservative estimate and a good-faith attempt at settlement," by Freshway, and that, until it received certain outstanding discovery from Henry's, it was "unwilling to reduce [that] demand." *Id.* On its face, that letter might be construed as a simple offer to settle the case for $10,000. However, we conclude that we are obligated to look back to the "[t]he ten thousand dollar figure suggested a few months ago," as Freshway clearly refers back to its letter of November 1, 2002.

The letter accompanied the production of documents, which Freshway felt supported its breach of contract claim. Freshway pointed Henry's to certain of those documents, which it believed demonstrated that an "internal audit indicated that the value of that contract claim was in excess of $10,000," and stated that it would soon be requesting additional documents from Henry's, to further assist in valuing that claim. *Exhibit C to Henry's Brief.* Freshway then noted that it was "prepared to discuss a dismissal of the trade dress claims upon a resolution to the breach of contract claim," and urged Henry's to contact it, if Henry's was "interested in further discussing a resolution to the breach of contract claim." *Id.*

Although it is largely irrelevant,[4] we mention here, in the interest of completeness, that we do not regard the correspondence of November 1, 2002, as an offer to settle but, rather, as an invitation to Henry's to make an offer to settle. The terms of that letter are not sufficiently "clear, definite, and explicit," so as to constitute an offer, but reflect Freshway's assessment of the value of its claims. *Short v. Sun Newspapers, Inc.,* supra at 786. We believe that the letter is, instead, an invitation to Henry's to present an offer to settle, after having considered the position advocated by Freshway. *Id.* (discussing the distinction between an offer and an invitation to make an offer). As we have previously related, Henry's took Freshway up on that invitation, and offered to settle the entire case for $3,000—an offer that Freshway flatly rejected on December 20, 2002.

What is important about the letter of November 1, 2002, how-ever, is the fact that it clearly reflects that Freshway's intent was to negotiate a satisfactory settlement of the breach of contract claim, and thereafter "discuss a dismissal of the trade dress claims." *Exhibit C to Henry's Brief.* It is also clear that the $10,000 figure contained therein, related to the value that Fresh-way placed on its breach of contract claim, and not on the case as a whole. When we consider the letter of November 1, 2002, together with the letter of January 3, 2003, we can only fairly read the latter as constituting an offer to settle the breach of contract claim for $10,000. In that letter, Freshway specifically referenced the parties' disagreement concerning the value of that claim, and then referred Henry's back to its letter of November 1, 2002, which only dealt only with the breach of contract claim. In contrast, Henry's proposed Settlement Agreement and Release, and Stipulation of Dismissal, which were attached to its letter of January 7, 2003,

---

4. Largely irrelevant for, even if the letter of November 1, 2002, contained a firm offer to settle, Henry's response of December 9, 2002, which contained an offer to settle for $3,000, served as a counteroffer, that is, as a rejection, and a new offer. Accordingly, even if that letter contained a demand from Freshway, it was, in any event, rejected by Henry's.

plainly contemplated the dismissal of the entirety of the case, in exchange for the payment of $10,000. Such an "acceptance," perforce, does not mirror the offer, and therefore, an enforceable contract was not reached.

While we acknowledge the theoretical possibility that, during the course of their telephonic negotiations, the parties did agree that the entire case should settle for $10,000—particularly given the fact that Freshway had admitted that the breach of contract was the more valuable of its claims, and had suggested that, if that claim could be settled for a satisfactory amount, it might also dismiss its trade dress claims—we are not presented with any evidence which supports such a surmise. Instead, the evidence reveals that Freshway made an offer to settle its breach of contract claim, and would consider, after that, dismissing its trade dress claim, while Henry's purported "acceptance" contemplated the settlement of the case as a whole.

Given the foregoing, we construe Henry's letter of January 7, 2003, as a counteroffer, and not as an acceptance, which was rejected by Freshway, in its letter of January 17, 2003, by means of a fresh counterproposal. As Henry's rejected the terms of that counterproposal, we conclude that no enforceable contract was consummated by the parties, and we deny Henry's Motion to Enforce the Settlement Agreement.

**B.** *Henry's Motion for Summary Judgment.*

Henry's seeks Summary Judgment as to Counts One through Seven of Freshway's Amended Complaint, which are predicated on Federal law, and further requests that we decline to extend supplemental jurisdiction over Counts Eight and Nine, and dismiss those Counts, but without prejudice.[5]

1. *Standard of Review.* Summary Judgment is not an acceptable means of resolving triable issues, nor is it a disfavored procedural shortcut when there are no issues which require the unique proficiencies of a Jury in weighing the evidence, and in rendering credibility determinations. See, *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Duffy v. Wolle,* 123 F.3d 1026, 1040 (8th Cir.1997), cert. denied, 523 U.S. 1137, 118 S.Ct. 1839, 140 L.Ed.2d 1090 (1998). Summary Judgment is appropriate when we have viewed the facts, and the inferences drawn from those facts, in a light most favorable to the nonmoving party, and we have found no triable issue. See, *Eide v. Grey Fox Technical Servs. Corp.,* 329 F.3d 600, 604 (8th Cir.2003); *Philip v. Ford Motor Co.,* 328 F.3d 1020, 1023 (8th Cir.2003); *United Fire & Casualty Ins. Co. v. Garvey,* 328 F.3d 411, 413 (8th Cir.2003). For these purposes, a disputed fact is "material" if it must inevitably be resolved and the resolution will determine the outcome of the case, while a dispute is "genuine" if the evidence is such that a reasonable Jury could return a verdict for the nonmoving party. See, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Fenney v. Dakota, Minnesota & Eastern R.R. Co.,* 327 F.3d 707, 711 (8th Cir.2003); *Jenkins v. Southern Farm Bureau Casualty,* 307 F.3d 741, 744 (8th Cir. 2002); *Herring v. Canada Life Assurance Co.,* 207 F.3d 1026 (8th Cir.2000).

As Rule 56(e) makes clear, once the moving party files a properly supported Motion, the burden shifts to the nonmov-

---

**5.** Claims Eight and Nine are State law based claims of breach of contract, and conversion. *Amended Complaint,* at 10. Claims Four, Five, and Six, also allege claims under State law, but Henry's asks that we address those claims, on their merits, as they mirror, or closely relate to, Freshway's claims under Federal law.

ing party to demonstrate the existence of a genuine dispute. In sustaining that burden, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." *Rule 56(e), Federal Rules of Civil Procedure;* see also, *Anderson v. Liberty Lobby, Inc.,* supra at 256, 106 S.Ct. 2505; *Eddings v. City of Hot Springs, Ark.,* 323 F.3d 596, 602 (8th Cir.2003). Moreover, the movant is entitled to Summary Judgment where the nonmoving party has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* supra at 322, 106 S.Ct. 2548; see also, *Mercer v. City of Cedar Rapids,* 308 F.3d 840, 843 (8th Cir.2002); *Hammond v. Northland Counseling Center, Inc.,* 218 F.3d 886, 891 (8th Cir.2000). No genuine issue of fact exists in such a case because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett,* supra at 323, 106 S.Ct. 2548; see also, *Bell Lumber and Pole Co. v. United States Fire Ins. Co.,* 60 F.3d 437, 441 (8th Cir.1995); *McLaughlin v. Esselte Pendaflex Corp.,* 50 F.3d 507, 510 (8th Cir.1995); *Settle v. Ross,* 992 F.2d 162, 163 (8th Cir.1993).

2. *Legal Analysis.*

a. *Henry's Motion for Summary Judgment as to Freshway's Claims of Trademark/Service Mark Infringement.*

Claims Two, Three, and Six, of Freshway's Amended Complaint allege Trade and Service Mark infringement, in violation of Title 15 U.S.C. § 1114, Federal common law, and Chapter 333 of the Minnesota Statutes, respectively. Henry's argues that it is entitled to Summary Judgment as to each of those claims, because Freshway has conceded that Henry's trade and service marks, do not violate Freshway's registered marks.

■ 1) *Claims Two and Three.* At the time of the Hearing, Freshway conceded that it could not state a claim of trademark infringement, under either Federal statutory, or common law, as Henry's logo did not infringe upon Freshway's protected logo. Although Freshway had suggested, in its Memorandum in Opposition to Henry's Motion that, under the relevant law, "the difference between trade dress and trademark is no longer of importance in determining whether trade dress is protected by law," and that its claims of trade dress infringement were simply a subspecies of trademark infringement, which are actionable under the laws governing trademarks, Freshway has apparently, and we find properly, abandoned that position. See, *Freshway's Memorandum of Law in Opposition to Henry's Motion for Partial Summary Judgment* ("Freshway's Brief"), at 2 (" * * * Freshway does not contest the fact that, from a pure trademark analysis, the Deli Max logo itself does not violate Freshway's federally registered trademark logo."). Claims Two and Three allege violations of Title 15 U.S.C. § 1114, or the Federal common law of service mark infringement, which are distinct from an action under Title 15 U.S.C. § 1125— that is, one asserting trade dress infringement. Accordingly, in the absence of any proof of a violation of either Section 1114, or the Federal common law of service mark infringement, we grant Henry's Summary Judgment as to those Claims.

■ 2) *Claim Six.* In this Claim, Freshway alleges that Henry's violated State Trademark laws and, in the context of Freshway's prior Motion to Amend its

Complaint, we have previously addressed the viability of that action.[6] In its opposition to that Motion, Henry's correctly noted that Minnesota Statutes Section 333.29 [7] only provides relief for an infringement of a mark which has been registered, under Sections 333.18—333.31, with the office of the Minnesota Secretary of State. While Freshway admitted that its mark had not been so registered, it pointed to Section 333.41, and asserted that it could state a claim under that provision, which did not contain such a registration prerequisite.

Section 333.41 provides as follows:

When any person, or any association or union of workers, shall have adopted or used any label, trademark, term, design, device, or form of advertisement for the purpose of designating, making known, or distinguishing any product of labor as having been made, produced, prepared, packed, or put on sale by such person, association, or union, or by a member thereof, it shall be unlawful to counterfeit or imitate the same, or to use, sell, offer for sale, or in any way utter or circulate, any counterfeit or imitation of any such label, trademark, term, design, device, or form of advertisement.

In our Order which granted Freshway's Motion to Amend, we construed "this statutory provision as being focused on products which bear a 'union label' so as to distinguish that product from non-union goods." Our reading of the provision was guided, in part, by the fact that the apparent "genesis for the Statute was the Minnesota Supreme Court's decision in *Ci-gar–Makers' Protective Union v. Conhaim*, 40 Minn. 243, 41 N.W. 943 (1889), which held that such 'union labels' were not protectible trademarks." We further related that we were not convinced that, after the Minnesota Legislature's amendments to Section 333.29, in 1998, there remained any "viable civil action, under Minnesota State law, for any marks not registered with the Minnesota Secretary of State." *Order of October 8, 2002* [Docket No. 50], at p. 4. Despite the stated concern, in the absence of any clear guidance from Minnesota cases, and given the standard by which we assess the futility of a proposed claim, we could not state, under Rule 12(b)(6), Federal Rules of Civil Procedure, that no claim could be stated as a matter of law, and we granted Freshway's Motion to Amend. See, *Brancheau v. Residential Mortgage Group, Inc.*, 177 F.R.D. 655, 656 (D.Minn.1997). We cautioned, however, that the addition of such a claim "may well prompt a future dispositive Motion." *Id.* at p. 5.

We now confront that dispositive Motion, and Henry's submits that we should adopt our prior analysis, and conclude that Section 333.41 only applies to "union labels," which are not at issue here, with the consequence that Claim Six fails to assert a viable cause of action. Henry's also underscores that the only remedies allowed for violations of Section 333.41 are criminal in nature, and urges that, as a result, Section 333.41 cannot provide a viable basis for a civil claim, even one seeking injunctive relief. Indeed, Section 333.42

---

**6.** This case was initially filed in South Dakota, and was, subsequently, transferred to this Court. See, *Goddard, Inc. v. Henry's Foods, Inc.*, 161 F.Supp.2d 1006 (D.S.D.2001). The initial Complaint had contained a claim for State Trademark violation under South Dakota law, and Freshway requested leave to amend its Complaint, so as to reflect the laws of the new venue.

**7.** Minnesota Statutes Section 333.29, Subdivision 1, provides, in pertinent part, as follows: An owner of a mark registered under sections 333.18 to 333.31 may bring an action to enjoin the manufacture, use, display, or sale of any counterfeits or imitations of the mark, and a court of competent jurisdiction may grant injunctions to restrain the manufacture, use, display, or sale as the court considers just and reasonable.

provides that a person who counterfeits such a label, "shall be punished by imprisonment in the county jail for not more than three months, or by a fine of not more than $100;" Section 333.44 makes it a misdemeanor to fraudulently register such a label; and the Section makes it a misdemeanor to unlawfully use, or display, a registered label.

At the time of the Hearing, Freshway acknowledged that only criminal penalties were allowed under the Statute, and that the Private Attorney General Act, *Minnesota Statutes Section 8.31, Subdivision 3a,* which, in some instances, allows a private individual, in the stead of the Government, to pursue remedies for violating certain statutes, does not apply to Section 333.44. Even so, Freshway advised that it was requesting injunctive relief under the Statute.

We have canvassed the law, and have found no case authority, under State or Federal law, which definitively addresses the scope of Section 333.41. The only annotations to Section 333.41 cite to the *Cigar–Makers* case, which served as the genesis of the Section, and to a Minnesota Attorney General opinion of May 10, 1953, to the effect that a "Trademark or form of advertising, which does not distinguish any product of labor, but which is used only for advertising and general promotional activities, may not be registered in the office of the Secretary of State." As a consequence, we adhere to our initial reading of the Statute—a reading that is bolstered by the *Cigar–Makers* decision, the Attorney General's opinion, and the absence of an attempt, by anyone, to litigate a civil claim such as Freshway has attempted here.

Given the absence of any authority which recognizes a civil action under the referenced Section, much less the availability of injunctive relief, Freshway has failed to sustain its burden of demonstrating a cognizable cause of action, and we grant

Summary Judgment to Henry's as to Claim Six. We are confident that, if the Minnesota Legislature had intended private parties to seek civil relief under the Section, whether it be compensatory damages, or equitable relief, provision for such a claim would have been expressly stated. In view of the Record submitted here, we decline to legislate a cause of action which the Minnesota Legislature has failed to recognize.

b. *Henry's Motion for Summary Judgment as to Freshway's Unfair Competition Claims.*

In Claims Four and Seven of its Amended Complaint, Freshway alleges that Henry's has committed unfair competition, in violation of State and Federal common law. Finding the claims to be without merit, we grant Summary Judgment to Henry's as to those claims.

■ 1) *The State Law Claims.* Under Minnesota law, "[u]nfair competition is not a tort with specific elements," but rather, it "describes a general category of torts which courts recognize for the protection of commercial interests." *Rehabilitation Specialists, Inc. v. Koering,* 404 N.W.2d 301, 305–06 (Minn.App.1987). Under this doctrine, if we find that the underlying tort is duplicative of another Count of the Complaint, the claim for unfair competition must be dismissed. See, *Zimmerman Group, Inc. v. Fairmont Foods of Minnesota Inc.,* 882 F.Supp. 892, 895 (D.Minn.1994)(dismissing claim to the extent that it was duplicative of, or was preempted by, other claims in the Complaint). In order for such a "claim to stand, [the Plaintiff] must identify the underlying tort which is the basis for the unfair competition claim." *Id.*

■ Here, Freshway has identified no such tort. Rather, in its Amended Complaint, Freshway has simply realleged the

facts supporting all of its claims, and has then has asserted that those "acts constitute trademark, service mark, trade dress, and copyright infringement resulting in unfair competition, and passing off in violation of the common law of the State of Minnesota." *Amended Complaint*, at 10. "To the extent that the unfair competition claim is based upon acts" of trade and service mark, trade dress, and "copyright infringement, it is preempted" by the Federal law governing such acts. *Zimmerman Group, Inc. v. Fairmont Foods of Minnesota, Inc.*, supra at 895. Since Freshway has identified no independent tort that provides the basis for its unfair competition claim, we grant Summary Judgment to Henry's on Claim Seven of the Amended Complaint.

■ 2) *Federal Common Law Claims.* We also grant that portion of Henry's Motion for Summary Judgment as to Claim Four of the Amended Complaint, which alleges unfair competition in violation of Federal common law, because no such law exists.

Federal Courts have held that, "[g]enerally, 'there is no federal common law of unfair competition;' a claim for relief must 'rest on a federal statute which defines and provides relief for this type of tort.'" *Telecom International America, Ltd. v. AT & T Corp.*, 67 F.Supp.2d 189, 215 (S.D.N.Y.1999), quoting *Water Tech. Corp. v. Calco, Ltd.*, 850 F.2d 660, 670 (Fed.Cir. 1988), cert. denied, 488 U.S. 968, 109 S.Ct. 498, 102 L.Ed.2d 534 (1988); see also, *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78–79, 58 S.Ct. 817, 82 L.Ed. 1188 ("There is no federal general common law,"); *Moore U.S.A., Inc. v. Standard Register Co.*, 139 F.Supp.2d 348, 361 n. 6 (W.D.N.Y. 2001)("[T]here is no federal law claim for unfair competition."); *Northwest Power Prods. Inc., v. Omark Indus., Inc.*, 576 F.2d 83, 88 (5th Cir.1978). The relief that Freshway seeks, for the actions claimed to be competitively unfair, is provided under the Lanham Act. See, *Water Tech. Corp. v. Calco, Ltd.*, supra at 670 n. 8 (citing the Lanham Act, as providing relief for unfair competition "in the area of protection of trade identity and false advertising" as an example of the "very narrow grounds for relief from unfair competition" provided by Federal statutes). The Plaintiff has alleged such a statutory claim, and there are no separate grounds to state the same claim under Federal common law. Accordingly, we grant this aspect of Henry's Motion, as well.

> c. *Henry's Motion for Summary Judgment as to Freshway's Lanham Act, and State Law Deceptive Trade Practices Claims.*

Given the foregoing, the only Claims, targeted by Henry's, that remain substantively at issue are Claims One and Five, in which Freshway alleges false representation and false designation of origin, in violation of Title 15 U.S.C. § 1125(a), and deceptive trade practice in violation of Minnesota Statutes Section 325D.44.

As to the trade dress Claim, we face an initial conundrum of considerable proportion. While Section 1125 does not so expressly provide, its language, either implicitly, or by way of construction, requires that the alleged infringer's use of the asserted trade dress not be authorized by the owner of that dress. We could not plausibly allow an infringement action if, for example, the alleged infringer's employment of the trade dress had been authorized by a license agreement, or some other contract, with the owner of the dress. Indeed, if authorization to display the dress were afforded to the person engaged in such a display, no action could lie because there would be no "false designation of origin, false or misleading description of fact, or false or misleading representation of fact." *Title 15 U.S.C. § 1125(a)(1).*

Here, Henry's correctly notes that Freshway has not commenced any infringement action against the eight store owners whose fast-food displays are the target of Freshway's lawsuit against Henry's. According to Henry's, the store owners are the real parties in interest, who should have been the named Defendants in this action. It is undisputed that, when the eight stores, which are at issue in this litigation, terminated their contractual relationship with Freshway, they were permitted to keep the equipment that they had purchased from Freshway, and were unrestricted, by any agreement with Freshway, as to the use of that equipment, apart from a requirement that they remove Freshway's logo, and trademark, from their stores. [Tr. 55–59]. Henry's maintains that, because it did no more than "permit" the store owners to continue their use of the equipment that the stores owned, if Freshway has a complaint against anyone for trade dress infringement, it would be against the individual store owners, and not Henry's. *Id.* at 60.

Freshway counters by arguing that trade dress infringement is a tort, such that any person who knowingly participates in furthering the infringement may be contributorily liable for that infringement, or be liable as a joint tortfeasor. According to Freshway, knowing participation in the furtherance of infringement is sufficient to impose liability upon Henry's. Freshway contends that, by Affidavit, William Hill ("Hill"), who is the owner of a store in Onamia, Minnesota, which converted from Freshway to Deli Max in 1999, has averred that Henry's agent informed him that he need only remove the Freshway logo, in order to continue his business as a Deli Max. As related by Freshway, such an averment is sufficient to raise a question of material fact, as to whether Henry's encouraged store owners to infringe Freshway's trade dress, or

knowingly supplied products to those who Henry's knew, or had reason to know, were doing so. *Affidavit of William Hill, attached as Exhibit B to Freshway's Memorandum of Law.* Freshway underscores that Hill has averred that he was specifically advised, by an employee of Henry's, that he could continue to use the Freshway counter, menu board, canopy awning, and outdoor sign, that he had purchased from Freshway. *Id.*

 It is clear that the Lanham Act does not, by its plain terms, limit liability to a direct infringer, but allows for secondary liability. As the United States Supreme Court has explained:

[L]iability for trademark infringement can extend beyond those who actually mislabel goods with the mark of another * * *. Thus, if a manufacturer or distributor intentionally induces another to infringe a trademark, or if it continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement, the manufacturer or distributor is contributorily responsible for any harm done as a result of the deceit.

*Inwood Labs., Inc. v. Ives Labs., Inc.,* 456 U.S. 844, 853–54, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982) (finding secondary liability under Section 32 of the Lanham Act); see also, *AT & T Co. v. Winback and Conserve Program, Inc.,* 42 F.3d 1421 (3rd Cir.1994)(extending the holding in *Inwood* to Section 43(a) of the Lanham Act).

 Thus, secondary liability is available under the Lanham Act, but that leaves unanswered the contention that the store owners' use of the claimed trade dress was sanctioned by Freshway.

Our analysis of the issue is constrained by the failure of either party to offer copies of the agreements, between the store owners and Freshway, for our review. Nevertheless, evidence has been adduced which bears on that contractual issue. At

the time of the Hearing on Freshway's Motion for a Preliminary Injunction, Goddard provided the following testimony on cross examination:

Q. You had a contract with each of these eight stores, true?

A. Yes.

Q. And in the contract there's a 60 day out, isn't there, that either party can get out by giving the other party a 60 day notice; isn't that right?

A. (No response.)

Q. Is that correct?

A. No, it's not correct.

Q. Okay. In the contract that is involved with these eight stores. When there's a termination, is it correct that * * * Freshway does not require any termination of the use of the awnings, counters, sneeze guards, or menu boards?

A. Menu boards, yes. Menu, we have restrictions on the menu board itself they could use, replace, come up with their own menu.

Q. Let me ask the question again. In the contract is there any restriction for the store owner to continue to use the awnings?

A. No.

Q. Is there any restriction on their continued use of the counters?

A. No.

Q. Is there any restrictions on the continued use of the sneeze guards?

A. No.

Q. Is there any restrictions on the continued use of the menu boards?

A. The boards themselves, no. The menu, yes.

Q. Thank you. I understand that since May 15 of 2001, what we just talked about is no longer the case. That you do now have restrictions with your customers; is that right?

A. We have converted Freshway from a licensed program to a franchise, so, yes.

Q. And so now if you're a Freshway store, in your contract with the store owner, that store owner can't just simply continue to, after the termination with the Freshway, they can't just simply continue to use the awnings and the counters, right?

A. No. We haven't written what we will require them to take down yet.

Q. You have not done that?

A. No.

Q. So it remains that you can continue to use the awnings and counters?

A. No. We have not written the part of the agreement if they leave us what they're required to take down.

Tr. 35–37.

Given this testimony, it is undisputed that the store owners employed many of the components of Freshway's alleged trade dress without any contractual constraint to cease doing so. Indeed, the evidence is clear that the only contractual restriction, which involved Freshway's trade dress, required the store owners to remove the Freshway trademark, and logo, after terminating their relationship with Freshway. See, *Plaintiff's Responses to Defendant's Admissions, Exhibit 35 to Affidavit of Amy J. Doll,* dated May 7, 2003.[8]

While we understand Freshway to urge that Henry's is a joint tortfeasor, and that

---

8. In responding to Henry's Requests for Admissions 4 through 11, Freshway responded, with respect to each of the eight store owners, that Freshway "required store to remove logo from canopies and counters," and "admits that it did not specifically contract to 'change or remove the décor, counters, or canopy awnings upon terminating its contract with Plaintiff.'" *Plaintiff's Responses to Defen-*

a trade dress action is viable against it on that basis, a tort only exists if there exists a duty, on the part of the alleged tortfeasor, which has been unlawfully breached. In the absence of any showing that the store owners were precluded from continuing the use of the equipment that they had purchased from Freshway, we are unable to find any duty. We are not presented with a whit of evidence that, after the termination of the license agreements, the store owners were obligated to alter, or dispose of, the displays they purchased from Freshway, apart from having to abandon Freshway's trademark and logo, which the store owners accomplished.

We are hardpressed, on this Record, to find any infringement by Henry's, when the very conduct of continuing with the décor, counters, and awnings, which Freshway now proclaims as trade dress, were fully authorized to be continued, and maintained, in the eight stores involved in this lawsuit. Moreover, the distinction between Freshway's purported trade dress, and its trademark and logo, is telling, for as to the latter, Freshway was sufficiently concerned about the proprietary value of the trademark, and logo, as to require their relinquishment at the time a license agreement was terminated. No such relinquishment was applicable to the remaining components of Freshway's purported trade dress.

Given the Record presented, there is abundant support for the absence of any contractually required abandonment of Freshway's claimed trade dress, apart from its logo and trademark. The Record is uncontested that, in order to induce store owners to enter contracts with it, Freshway allowed great flexibility in designing fastfood displays that conformed with the store owners' existing décor, as opposed to Freshway's. See, Tr. 40.[9] In fact the only constants in Freshway's displays were the presence of its logo and trademark, and the great variety in colors employed, and overall visual effect. In view of the store owners' outright purchase of displays that were suited to their own specifications, we can readily understand Freshway's election not to request, or demand, that the store owners alter, or remove, the displays purchased from Freshway.[10] Indeed, notwithstanding our

---

dant's Admissions, Exhibit 35 to Affidavit of Amy J. Doll, dated May 7, 2003.

9. At the time of the Evidentiary Hearing, on Freshway's Motion for a Preliminary Injunction, Goddard confirmed the continued accuracy of her prior, deposition testimony:

Q. What choices do you give to the store owner to make?

A. They can pick if they want just pizza, if they want subs and salads or if they want chicken or a combination of any of these. We also train them on bakery and ice cream, if they want.
Some keep hot dog rollers, some don't.
We're very flexible in that they can serve other foods out of a Freshway. They can't do anything to the logo or any of that appearance, but if they wanted their store to [be] all matched counterwise and they wanted the deli counter to be the same as their other counters, we could do

that. Or if they want to go with our colors, we do that. Some want it to look different. Some want it to look the same.
Tr. 40.

10. In our prior Order, which denied Freshway's Motion for preliminary injunctive relief, we observed, in part, as follows:

Freshway frames its argument on this issue by directing us to the photographs which depict two store displays, first as a Freshway outlet, and then, later, as a Deli Max. See, Exs. 2A, 2B, 3A, 3B. Admittedly, the displays appear largely identical, except for the trademark, and symbol, depicting either [the] Freshway or Deli–Max logo.
Order of October 1, 2002, at p. 34.
Freshway quotes this passage to suggest some finding, by us, of uniform identity between Freshway's design, and Henry's. See, Freshway's Brief, at 14. Freshway's reading, how-

prior forewarning, in our Order denying Freshway's request for equitable relief, Freshway has advanced no showing that "cease and desist" notices were provided to the store owners, or that any attempt was made to preclude the store owners continued use of Freshway's purported trade dress.

Notably, Freshway offers no authority that, under the unique circumstances presented here, Henry's should be held to a more exacting standard than Freshway has held the store owners. On this Record, we conclude that Freshway authorized the continued use of the displays at issue, thereby precluding any viable claim of trade dress infringement by Henry's. We do not, however, pinion our decision solely on that basis, and we continue to analyze Freshway's trade dress Claim as if Freshway had not authorized the very conduct it now seeks to challenge, albeit derivatively. Accordingly, we turn to the usual framework in assessing the merits of Henry's Motion for Summary Judgment.

■■■ 1) *Standard of Review.* We note at the outset that the Minnesota Deceptive Trade Practices Act, as codified in Minnesota Statutes Section 325D.43–48, enjoins the same false and deceptive practices that are unlawful under the Lanham Act and, as a result, plaintiffs typically incorporate their claims under both the Federal and State statutes. See, *Alternative Pioneering Systems, Inc. v. Direct Innovative Prods., Inc.,* 822 F.Supp. 1437, 1441 (D.Minn.1993); *Multi–Tech Systems, Inc. v. Hayes Microcomputer Prods., Inc.,* 800 F.Supp. 825, 847 (D.Minn.1992), appeal dismissed, 988 F.2d 130 (Fed.Cir.1993). Conduct that violates the Lanham Act also violates Minnesota's Deceptive Trade Practices Act, and a Complaint which adequately states a claim under the Lanham Act, also states a claim under Minnesota's Statute. *Id.* As a consequence, while we address Henry's Motion in context of the Lanham Act, our analysis applies equally to Freshway's State law claim.

For years, the Federal Courts have analyzed trade dress infringement under the general trademark infringement provisions of Section 43(a) of the Lanham Act, *Title 15 U.S.C. § 1125(a)(1)(A),* which provides a cause of action for injury caused by the use of "any work, term, name, symbol, or device, or any combination thereof * * * which * * * is likely to cause confusion * * * as to the origin, sponsorship, or approval of his or her goods," "on or in connection with any goods or services, or any container for goods." See also, *TrafFix Devices, Inc. v. Marketing Displays, Inc.,* 532 U.S. 23, 29, 121 S.Ct. 1255, 149 L.Ed.2d 164 (2001). In 1999, however, Congress amended the Lanham Act to provide spe-

---

ever, is unduly pinched, for we went on to state:

> There is a distinctively different consideration here, however, as seven of the eight stores, which switched from being a Freshway to a Deli–Max, had a previous relationship with Henry's, as Henry's supplied other goods to those stores. Moreover, it appears that the reason that the Deli–Max stores kept the "look" left behind by Freshway, when those stores converted to Deli Max, was because Freshway did not require, by contract or other legal means, to store owners to change that "look."
> As we observed during the course of the Hearing, if that "look" was sufficiently pro-

prietary to Freshway, one would have thought that the proprietary interest would have been exclusively reserved, by contract, to the stores which exclusively sold Freshway products. Since the store proprietors owned the components of the food service area, we are aware of no requirement, absent a contract or the protections of trademark law, which would require those store owners to alter the appearance of the displays they chose, at Freshway's invitation, simply because the owners severed their ties with Freshway.

*Id.* at 36–37.

cific protection for trade dress. See, *Title 15 U.S.C. § 1125(a)(3)*. Nonetheless, even with a separate Statute providing the cause of action for an infringement of trade dress, as opposed to trademarks, it is important to note that "[t]he difference between trade dress and trademark is no longer of importance in determining whether trade dress is protected by federal law." *Aromatique, Inc. v. Gold Seal, Inc.*, 28 F.3d 863, 868 (8th Cir.1994); see also, *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 773, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992)("[Section] 43(a) provides no basis for distinguishing between trademark and trade dress.").

The Courts have generally defined "trade dress" as the " 'total image of a product, the overall impression created, not the individual features.' " *Children's Factory, Inc. v. Benee's Toys, Inc.*, 160 F.3d 489, 494 (8th Cir.1998), quoting *Insty*Bit, Inc. v. Poly–Tech Indus., Inc.*, 95 F.3d 663, 667 (8th Cir.1996), cert. denied, 519 U.S. 1151, 117 S.Ct. 1085, 137 L.Ed.2d 219 (1997); see also, *Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 601 n. 3 (8th Cir.1999). The United States Supreme Court has recently explained trade dress protection as follows:

> The design or packaging of a product may acquire a distinctiveness which serves to identify the product with its manufacturer or source; and a design or package which acquires this secondary meaning, assuming other requisites are met, is a trade dress which my not be used in a manner likely to cause confusion as to the origin, sponsorship, or approval of the goods.

*TrafFix Devices, Inc. v. Marketing Displays, Inc.*, supra at 28, 121 S.Ct. 1255. Thus, for example, a restaurant's trade dress might include "the shape and general appearance of the exterior of the restaurant," "the identifying sign," "the interior floor plan," "the appointments and decor items," "the equipment used to serve the food," "and the servers' uniforms." *Prufrock Ltd., Inc. v. Lasater*, 781 F.2d 129, 132 (8th Cir.1986).

However, trade dress law does not provide a blanket protection "from a competitor's imitation of one's marketing concept," or "the mere method and style of doing business." *Aromatique, Inc. v. Gold Seal, Inc.*, supra at 868; see also, *Prufrock Ltd., Inc. v. Lasater*, supra at 131–32 ("A franchisor does not have a business interest capable of protection in the mere method and style of doing business."). In order to receive protection for trade dress, under the Lanham Act, a claimant must show that the identifying mark is distinctive and capable of being protected, by showing that it is either inherently distinctive, or has acquired distinctiveness through secondary meaning; that the trade dress is primarily non-functional; and that there is a likelihood of confusion. *Wal–Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 209–14, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000); see also, *Two Pesos, Inc. v. Taco Cabana, Inc.*, supra at 769–70, 112 S.Ct. 2753; *Children's Factory, Inc. v. Benee's Toys, Inc.*, supra at 494; *Insty*Bit, Inc. v. Poly–Tech Indus., Inc.*, supra at 666.

Underlying both the functionality, and the distinctiveness requirements, is the general policy behind the Lanham Act, which is "to protect an owner of a dress in informing the public of the source of its products without permitting the owner to exclude competition from functionally similar products." *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 33 (2nd Cir.1995). In considering trade dress claims then, "the Lanham Act must be construed in the light of a strong federal policy of vigorously competitive markets" and, as such, "[g]eneric terms cannot be

protected because, inter alia, competitors need them to describe their products to consumers," where as "arbitrary or fanciful works and phrases may be appropriated by a single producer without depriving others of a means of describing their products to the market." *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 379–80 (2nd Cir.1997), citing *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2nd Cir.1976).

■ Therefore, "granting trade dress to an ordinary product design would create a monopoly in the goods themselves," because it would effectively prevent others from dispensing the same goods, and so, trade dress protection should only be offered where it would "accord protection to symbols consumers are likely to rely upon in distinguishing goods," and should be denied where it "would hamper efforts to market competitive goods." *Id.* Similarly, granting trade dress protection to fully functional features, " 'would put competitors at a significant non-reputation-based disadvantage.' " *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, supra at 32, 121 S.Ct. 1255, quoting *Qualitex Co. v. Jacobson Prods., Inc.*, 514 U.S. 159, 165, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995)("[A] design is legally functional and thus unprotectable, if it is one of a number of equally efficient options open to competitors and free competition would be unduly hindered by according the design trademark protection."). As a result, "trade dress protection must subsist with the recognition that in many instances there is no prohibition against copying goods and products." *Id.* at 29, 121 S.Ct. 1255.

2) *Legal Analysis.* As previously noted, the threshold determination, in ascertaining whether Henry's has infringed Freshway's trade dress, is a finding that Freshway has a protectible trade dress, which necessitates a showing, by Freshway, that its trade dress is distinctive, and

nonfunctional. We address each showing in turn.

a) *Distinctiveness.* Freshway maintains that its trade dress is suggestive, or even arbitrary, and is, therefore, inherently distinct. According to Freshway, neither its name, nor its trade dress, convey an "immediate idea of the ingredients, qualities or characteristics of the goods," such that a person who is unfamiliar with Freshway, or its trade dress, would not immediately think of the food sold by the Plaintiff, and it would require some "imagination to make the connection between the word Freshway, or its trade dress and sub sandwiches, pizza, salads, and chickens." *Freshway's Memorandum of Law in Opposition to Henry's Motion for Partial Summary Judgment* ("Freshway's Brief"), at 5. As such, Freshway maintains that we should find its trade dress arbitrary, or suggestive, as opposed to descriptive, or generic, and thereby, distinctive.

As to the requirement, that protectible trade dress should be distinctive, the Supreme Court has explained that such a showing is not expressly required by Section 43(a) of the Lanham Act, but has, nonetheless, been "universally imposed" by the Courts, "since without distinctiveness" the trade dress would not "cause confusion * * * as to the origin, sponsorship, or approval of [the goods]" as that Section requires. *Wal Mart Stores, Inc. v. Samara Bros., Inc.*, supra at 210, 120 S.Ct. 1339. There are two ways to prove the required distinctiveness, either by showing that the trade dress "is inherently distinctive," as " '[its] intrinsic nature serves to identify a particular source,' " *id.* at 210, 120 S.Ct. 1339, quoting *Two Pesos, Inc. v. Taco Cabana, Inc.*, supra at 768, 112 S.Ct. 2753, or "it has developed a secondary meaning, which occurs when, 'in the minds of the public, the primary significance of the [mark] is to identify the source of the

product rather than the product itself.'" *Id.* at 211, 120 S.Ct. 1339, quoting *Inwood Labs., Inc. v. Ives Labs., Inc.,* supra at 851 n. 11, 102 S.Ct. 2182.

In determining whether a mark is distinctive, we first categorize "the mark as either generic, descriptive, suggestive, or arbitary [or fanciful]." *General Mills, Inc. v. Kellogg Co.,* 824 F.2d 622, 625 (8th Cir.1987), citing *Co–Rect Prods., Inc. v. Marvy! Advertising Photography, Inc.,* 780 F.2d 1324, 1329 (8th Cir.1985); see also, *Stuart Hall Co., Inc. v. Ampad Corp.,* 51 F.3d 780, 785 (8th Cir.1995). Suggestive or fanciful trade dress is inherently distinctive, see *Stuart Hall Co., Inc. v. Ampad Corp.,* supra at 785, and is protected, under the Lanham Act, without a showing that it has acquired secondary meaning. *Two Pesos, Inc. v. Taco Cabana, Inc.,* supra at 767, 112 S.Ct. 2753. Descriptive trade dress, however, is not inherently distinctive, and therefore, a showing of secondary meaning is necessary. See, *Stuart Hall Co. v. Ampad Corp.,* supra at 785. Generic trade dress is not protectible under the Lanham Act. *Id.*

In delineating between trade dress, which is inherently distinctive, and that which is merely descriptive, our Court of Appeals has instructed:

> The distinction between suggestive and descriptive trademarks, and thus between distinctive and nondistinctive trademarks was delineated in *Abercrombie [ & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2nd Cir.1976) ]: "A term is suggestive if it requires imagination, thought and perception to reach a conclusion as to the nature of goods. A term is descriptive if it forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods. * * * These definitions address the relation between the product and the trade dress, not the relation between the

trade dress and the consumer. The question they present is whether, and how much, the trade dress is dictated by the nature of the product, not whether consumers remember or are struck by the design, or whether consumers associate the design with its source. If the specific design of the trade dress is only tenuously connected with the nature of the product, then it is inherently distinctive, and the secondary meaning, which requires a showing that consumers attach significance to the trade dress as a source-signifier, needs to be proven. If the design of the trade dress is dictated by the nature of the product, then secondary meaning must be proven."

*Stuart Hall Co., Inc. v. Ampad Corp.,* supra at 786; see also, *General Mills, Inc. v. Kellogg Co.,* supra at 625.

In so holding, our Court of Appeals appears to have implicitly endorsed the test that was enunciated in *Seabrook Foods, Inc. v. Bar–Well Foods Ltd.,* 568 F.2d 1342, 1344 (C.C.P.A.1977). See, *Stuart Hall Co., Inc. v. Ampad Corp.,* supra at 786. In *Seabrook,* the Court stated that, "[i]n determining whether a design is arbitrary or distinctive this court has looked to whether it was unique or unusual in a particular field [or] whether it was a mere refinement of a commonly-adopted and well-known form of ornamentation for a particular class of goods viewed by the public as a dress or ornamentation for the goods.'" *Id.,* quoting *Seabrook Foods, Inc. v. Bar Well Foods Ltd.,* supra at 1344; see also, *Children's Factory, Inc. v. Benee's Toys, Inc.,* supra at 494 n. 7. The focus of the test is "on a comparison of plaintiff's trade dress to others in the same class of goods, not on the trade dress' impact on consumers." *Stuart Hall Co., Inc. v. Ampad Corp.,* supra at 768–87.

In applying the test, even though "each element of a trade dress individually

might not be inherently distinctive, it is the combination of elements that should be the focus of the distinctiveness inquiry," such that, "[i]f the overall dress is arbitrary, fanciful, or suggestive, it is distinctive despite its incorporation of generic [or functional] elements." *Best Cellars, Inc. v. Grape Finds at Dupont, Inc.,* 90 F.Supp.2d 431, 451 (S.D.N.Y.2000), citing *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.,* supra at 32. That fact, however, "does not permit a plaintiff to dispense with an articulation of the specific elements which comprise its distinct dress," as "[w]ithout such a precise expression of the character and scope of the claimed trade dress, litigation will be difficult, as courts will be unable to evaluate how unique and unexpected the design elements are to the relevant market." *Landscape Forms, Inc. v. Columbia Cascade Co.,* supra at 381. Such a practice would result in the Court being "unable to shape narrowly-tailored relief," as the Court would "not know what distinctive combination of ingredients deserves protection." *Id.* Therefore, "a plaintiff's inability to explain to a court exactly what aspects of its product design(s) merit protection may indicate that its claim is pitched at an improper level of generality, i.e., the claimant seeks protection for an unprotectible style, theme, or idea." *Id.*

■ The generalized manner in which Freshway has described its trade dress counsels a finding that it is seeking protection for an unprotectible idea, as opposed to some concrete specification of an idea, and fosters a finding that its trade dress is not inherently distinctive. In its Amended Complaint, Freshway alleged that its trade dress "consisted of, among other things, a unique retail environment which includes an open store design so that customers can see product categories from the moment they enter the store, a unique combination of fixtures, displays, locations, and a menu heretofore not utilized by any other retail

company." *Amended Complaint,* at 2. The only other description of its trade dress, which has been provided by Freshway, as pled in its Amended Complaint, was that "[t]he layout and presentation of merchandise by Freshway is inherently distinctive in its size, shape, design, lettering, coloring, ordering over a counter, uniforms of employees, promotions, and packaging." *Id.* Such a general description plainly fails "to indicate what unique combination of features makes the trade dress * * * inherently distinctive," and is far "too abstract to qualify as trade dress," since it seeks protection for a "generalized type of appearance," rather than the "concrete expression" of that appearance. *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.,* supra at 32.

In the course of briefing, however, Freshway has provided us with a more particularized expression of what it believes is its protectible trade dress. For example, in its brief in support of its Motion for a Preliminary Injunction, Freshway highlighted its store design, its use of awnings, its color scheme, its menu design, its price structure, its ingredient labels, and its "Frequent Buyer Club" punch cards, as specific components of its trade dress. At the Hearing on that Motion, Joan Goddard ("Goddard"), who is Freshway's owner, testified that Fresh-way's trade dress included the front counter design, the equipment package, the menu board, and the photographs inserted in that board, the menu itself—in terms of its design and content—and its uniforms. In Goddard's Affidavit, which was submitted in opposition to Henry's present Motion, she further claims that Freshway's "[inch] pizza box, paper menu order forms, frequent buyer cards and menu selections have been a part of the trade dress for the pizza program," and that all locations selling submarine sandwiches and salads "had the front counter sign centered with the

refrigerated sub table, same floor plan, and same menu," and each "included a Beverage Air deli table, sneeze guard, drawer, adjustable legs for the counter, commercial Amana Microwave, paper menus, menu board system, uniforms, table tents, posters, frequent buyer cards, outdoor signage, window signage, canopy awnings and all the necessary smallwares." *Id.* at 2. As to its uniforms, which it claims to be an element of its protected trade dress, Freshway has described them as including polo shirts, baseball hats, sweatshirts, and aprons.

While these descriptions are more specific than Freshway's initial portrayals of its trade dress, we are compelled to find that their generality fosters the conclusion that Freshway is seeking protection for an idea, or concept, as opposed to a concrete expression of that concept. Even when focusing, as is required, on the combined appearance of the elements claimed by Freshway, we are left without any clear picture of the specific overall look that the Plaintiff seeks to protect as inherently distinctive. Nevertheless, we conclude that Freshway's asserted elements of trade dress have been described with sufficient specificity, as would permit a finding that the Plaintiff is seeking to protect a concrete expression concerning the sale of fastfoods, in convenience stores, rather than to the more general concept of such sales. The elements of Freshway's claimed trade dress are generalized, when considered individually but, in combination, they do describe a particular "look" as opposed to simply a concept, or idea.

Such a finding, however, does not lead to the conclusion that Freshway's trade dress is inherently distinctive, as that determination requires us to consider the extent to which Freshway's trade dress is dictated by the product it is selling—a consideration which requires a comparison of trade dress employed by others in the same market. Under that more particularized test, we conclude that Freshway has not demonstrated that its trade dress—that is, its "total image of a product, the overall impression created, not the individual features"—is inherently distinctive. *Children's Factory v. Benee's Toys, Inc.,* supra at 494, quoting *Insty\*Bit Inc. v. Poly–Tech Indus. Inc.,* supra at 667.

Instead, we are compelled to find that Freshway's product identifies itself. The total look, which is achieved by Freshway's trade dress, was created with the type of products to be sold, and the locations of those sales, in mind. The use of a counter, on which to prepare the food products, and to present them to the customer, is required by the product, in a fastfood type of business, as is the type of equipment employed to heat the food which is to be sold. Likewise, the menu board is needed to inform the customers what food is available for sale. Freshway has contended that its paper menus were created in order to ensure that a person, who has ordered the food at the rear of the convenience store, pays for the goods at the register up front. Again, such a style of merchandising was dictated by the product, and the location of sale. Further, the awnings employed by Freshway, so as to identify the foods that are being sold, is dictated by the convenience store setting, as such stores sell a variety of products, the location of which are typically highlighted by the use of closely similar awnings.

We find nothing about Freshway's look which appears, in any form, as being suggestive, or as "requir[ing] some measure of imagination to reach a conclusion regarding the nature of the product" it sells. *Insty\*Bit, Inc. v. Poly–Tech Indus., Inc.,* supra at 673, n. 12. More succinctly stated, there is nothing in Fresh-way's trade dress design that was "invented solely for [Freshway's] use as * * * trade dress,"

and it is, therefore, not arbitrary or fanciful. *Id.*

The absence of anything inherently distinctive about Freshway's trade dress is also evidenced by Freshway's admission that it has not consistently employed all of the elements of its trade dress in all of its stores. Until 1996, the use of awnings was optional to the store owners, and Freshway concedes that it has been flexible as to the "color, size, and shape of the counters and awnings," so as to permit store owners to have a look generally consistent with the remainder of their individual stores. By way of one example, Freshway would allow the store owners to incorporate, into Freshway's trade design, the proprietary colors of the company which furnished the petroleum products for sale, at the convenience stores. This also evidences the fact that Freshway's trade dress was dictated by the products, as well as the location in which those products were sold, and was not "invented solely for [Freshway's] use as * * * trade dress." *Id.* The allowance of distinctive colors, and other features, so as to accommodate the individualized wishes of the store owners, relegates Freshway's trade dress into a fluid marketing concept distinctive only in its variety. If, as Freshway suggests, each of those varying designs carries the imprimatur of trade dress, then Freshway can monopolize the market simply be combining different color combinations, and other physical features, to deprive its competitors of any opportunity to market similar products.

Further, and perhaps most importantly, Freshway's convenience store counters look like other fastfood service centers, which are located in convenience stores, and are, in that respect, suggestive of the product being sold. The Record is rife with examples of store displays, which were designed by Freshway's competitors, and which reflect variations on a common theme—a counter, awnings, and bulletin board menus for ordering—all within the same, or highly similar configurations. These are highly indicative that it was the product, and not some other concern, which dictated the look of Freshway's trade dress. While, admittedly, some of the items, which are asserted to be a part of Freshway's trade dress—such as the punch cards, menu items, and paper menus—may be unique to Freshway's displays, those smaller items are an inappreciable aspect of Freshway's total appearance which, on the whole, is not distinctive from others competing in the same field.

Of course, we recognize that a restaurant or store may have inherently distinctive trade dress, as the Supreme Court has explicitly held, see *Two Pesos, Inc. v. Taco Cabana, Inc.*, supra at 770–76, 112 S.Ct. 2753, but we conclude that the Plaintiff has not raised a question of material fact as to that issue, here. We find particularly illustrative of trade dress that is inherently distinctive, the Court's analysis in *Best Cellars, Inc. v. Grape Finds at Dupont, Inc.*, supra, where the parties were competing retail wine dealers. There, the plaintiff had developed a concept of selling wine by taste, rather than by grape type or origin, which it felt would appeal to the untrained wine consumer. In turning this wine-by-taste concept into a reality, the plaintiff worked with designers and architects, and was successful in achieving what the Court described as "an 'anti-wine store.'" *Id.* at 451.

The trade dress, which was created by the fourteen elements asserted by the plaintiff, created a "wall of wine," consisting of "color coded iconographic wall signs, identifying eight taste categories above single display bottles of stainless-steel wire pedestals which r[an] along the store perimeter, above identical color-coded textually formatted square shelf-talkers, above

vertical arrays of nine glowing bottles stacked horizontally, above a strip of cabinets or drawers which extend[ed] to the floor." *Id.* at 452. The Court found that the plaintiff's wine store "look[ed] like no other wine stores" and, as a result, concluded that it was an example of inherently distinctive trade dress, as it was arbitrary, because it was "not suggestive of the product being sold, let alone descriptive or generic." *Id.* at 451.

Here, however, none of the elements, which supported a finding of inherent distinctiveness in *Best Cellars,* are present. First, we note the detailed description of the trade dress provided by the plaintiff there, which was consistently employed, in almost every element, throughout their stores. That, too, is not present here. Further, there, the end product looked like no other wine store, where as, here, the elements of Freshway's trade dress resemble those employed by its competitors. Finally, the elements of trade dress, as presented in *Best Cellars,* were not dictated by the product sold, but were the end result of careful planning and designing, with the intendment of creating a unique environment. Here, Freshway's trade dress is largely dictated by the products sold, as is evidenced by its similarity to the look presented by its competitors, as well as the reality that Freshway has not consistently adopted the same look in each of its sales locations. In sum, we conclude that no reasonable Jury could find the Plaintiff's trade dress to be inherently distinctive.

We proceed, therefore, to a consideration of whether Freshway's trade dress has acquired a distinctive character by virtue of secondary meaning. See, *Stuart Hall Co. v. Ampad Corp.,* supra at 785. We find that it has not, as such a determination is precluded by Freshway's admission that their use of the claimed trade dress has not been undeviating, and the Record is bereft of any showing that consumers recognize Freshway's trade dress as distinct from that of its competitors.

■ In order to demonstrate that trade dress has acquired secondary meaning, Freshway must show "that by long and exclusive use in the sale of the user's goods, the mark has become so associated in the public mind with such goods that the mark serves to identify the source of the goods and to distinguish them from those of others." *Aromatique, Inc. v. Gold Seal, Inc.,* supra at 870. The proper inquiry is whether Freshway's trade dress identifies it, even if its trademark, and accompanying design, are illegible or obscured. *Id.* The paramount consideration is " 'whether in the consumer's mind the mark has become associated with a particular source.' " *Id.* at 871, quoting *Co–Rect Prods. v. Marvy! Advertising Photography, Inc.,* supra at 1333–33.

■ In the context of a restaurant's trade dress, the issue may be stated as whether consumers recognize Freshway's trade dress as identifying Freshway's business. See, *Rally's, Inc. v. International Shortstop, Inc.,* 776 F.Supp. 451, 455 (E.D.Ark.1990), aff'd, 985 F.2d 565, 1991 WL 440055 (8th Cir.1991)[Table Decision]. The consumer need not, however, know the particular source's name. See, *Stuart Hall Co., Inc. v. Ampad Co.,* supra at 789. Relevant factors in the inquiry include "consumer surveys, deliberate copying of the mark, advertising featuring the trade dress at issue, expenditure on such advertising, and anecdotal evidence showing consumer identification of the trade dress with its source." *Id.,* citing *Aromatique, Inc. v. Gold Seal, Inc.,* supra at 871.

Freshway argues that it has been operating its food service business since 1992, and that, since 1995, has been selling the same menu items, all of which are packaged, and sold, under its Federal service

mark. It also asserts that its efforts to market its trade dress is evidenced by its repeated use of the same blue awning and counter display, particularly at yearly trade shows. Further, Freshway has attested that, as of one year ago, it had spent over $270,000.00 in advertising, and has sold over seven million sandwiches. As to deliberate copying of their trade dress, Freshway asserts that Henry's menu boards, paper menus, ingredients, ingredient labels, and store layouts, are all substantially similar to those of the Plaintiff.[11]

Here, the Plaintiff's claim runs into grave trouble. As to the issue of the length, and the exclusivity of its use of its trade dress, the Plaintiff has alleged as follows:

> Regarding the length and exclusivity of trade dress use Joan Goddard has previously testified that Freshway has been operating delistyle food services since 1992, and its four main menu items include delistyle sandwiches, salads, chicken and a pizza program that was added in 1995. These products are packaged and sold under the federal service mark of "Freshway Food Systems." * * * Furthermore for 11 years, Freshway Subs & Salads have been sold in 13 states in over 230 different locations. * * * Furthermore, to Goddard's knowledge, with the exception of Deli–Max, no other branded good service company has ever been installed in a former Freshway location and used the Freshway

counters, menu boards or outdoor signage.

*Plaintiff's Brief,* at 6 [citations omitted].

Such an assertion is wholly insufficient to prove a long and exclusive use of Freshway's trade dress.

While the assertion reflects how long Freshway has been operating its business, it does not reveal any consistency in use of any particular look that is being claimed by Freshway. Rather, the evidence presented, as well as Freshway's candid admission, establish that Freshway has not consistently incorporated the claimed trade dress, in each of its stores. In *Rally's Inc. v. International Shortstop, Inc.,* supra at 456, the Court found that a similar failure to consistently use "the features [the plaintiff] claim[ed] to be protected as a 'total package' in the same way in its own stores," amounted to a failure "to show that it has used the 'total package' exclusively for an significant length of time."

Moreover, Freshway's showing, as to the other relevant factors, is similarly lacking in substance. As to advertising, Fresh-way has submitted evidence that its advertising budget, over the past four and one-half years, was in excess of $270,000.00. Fresh-way also maintains that the fact that it repeatedly used the same blue awning and counter display, particularly at trade show exhibitions, is evidence that, through advertising, it has acquired a secondary meaning. However,

---

**11.** The Plaintiff also maintains that the fact that its service mark, and design, were first used in commerce in 1993, and that, under Title 15 U.S.C. § 1052(f), proof of five years' exclusive and continuous use of a mark, serve as prima facie evidence of a secondary meaning. As we did at the time of Freshway's Motion for a Preliminary Injunction, we reject the suggestion that continuous use of Freshway's service mark can support a finding of secondary meaning in this context. As we have related, in considering the existence of a secondary meaning, the paramount consideration is whether the Plaintiff's trade dress would identify it even if its trademark, and accompanying logo, were obscured from the customer's view. As a result, we are unable to find, on this Record, that the continuous use of a service mark to constitute prima facie evidence of an acquired secondary meaning under the circumstances presented here.

we are unable to assess the relevance of Freshway's advertising expense, as we have no showing that those advertisements were aimed at familiarizing the public with the identity of Freshway's products, by virtue of its trade dress, as opposed to some other aspect of the Plaintiff's product, or business. See, *Bloomfield Industries v. Stewart Sandwiches, Inc.,* 716 F.Supp. 380, 382 (N.D.Ind.1989)(noting that Court could not determine the relevance of evidence regarding advertising, and sales figures, as there was nothing to show that the figures were limited to the trade dress at issue); see also, *Rally's Inc. v. International Shortstop, Inc.,* supra at 456 (finding that advertisement which focused on the store's logo, the speed of its service, and the inexpensive nature of its food items, was not relevant to the issue of secondary meaning because the trade dress was not the focus of those advertisements).

Similarly, the fact that Freshway has consistently displayed its trade dress at trade shows, which are aimed not at the end consumer but at persons within the industry, is irrelevant to the secondary meaning issue for, on that question, we look to the mind of the consumer. See, *Aromatique Inc. v. Gold Seal, Inc.,* supra at 872 (concluding that articles, which were published in trade journals were irrelevant, because they were not read by the ordinary consumer).

Next, as to the number of its customers, Freshway has attested to having sold over seven million sandwiches, but we have no information as to the number of end consumers that number reflects, or as to what percentage of those sandwiches were sold in stores employing any one of Freshway's varied trade dress packages. Nor has Freshway proffered any evidence that, as a result of those sales, the consumers have identified its trade dress, with their products, since no consumer surveys, nor anecdotal evidence, has been presented to that effect.

Lastly, as to evidence of deliberate copying of Freshway's trade dress, Freshway points to the photographs of its store displays, and those of Henry's, in the referenced eight stores, which we had found to appear closely similar-apart from the prominent display of their respective logos as coupled with the testimony of Goddard, that the menu boards, paper menus, ingredients, ingredient labels, store layouts, and profit analysis systems, which are used by Henry's, are substantially similar. According to Freshway, given the prior business relationship between the parties, and the fact that Henry's had access to the very items that Freshway says were appropriated, we should find that Henry's deliberately copied its trade dress.

In *Rally's Inc. v. International Sportstop, Inc.,* supra at 456, the plaintiff alleged that the defendant was not the only party to have attempted to pirate its trade dress, and contended that those attempts evidenced that its trade dress had acquired secondary meaning. Notwithstanding that argument, the Court found that nearly all of the plaintiff's competitors utilized similar combinations of trade dress, and that the plaintiff had not consistently used its own claimed trade dress. As a result, the Court held that the plaintiff could not show that the defendant had attempted to pirate its trade dress. We think that the same may be said here. While Henry's used a design, on some occasions, that was similar to Freshway's trade dress-since the design remained after Freshway had lost the business relationship with the store owner—and had access to certain components of that trade dress, there was nothing so unique about that trade dress, other than Freshway's trademark, and logo, that made it distinctive, or unique. More importantly, there is no evidence that Hen-

ry's persuaded anyone to adopt Freshway's trade dress *ab initio*—in each instance, the store owner simply continued to employ the design that the owner had purchased, without restrictive constraints on its continued use, from Freshway.

Accordingly, since Freshway has made no competent showing of consistent, long-term, and exclusive use of its trade dress, or any demonstration that consumers had come to recognize its trade dress as being the source of Freshway's products, we conclude that no reasonable Jury could find that Freshway's trade dress is distinctive. Plainly, Freshway's failure to consistently employ its own claimed trade dress fatally undermines any such finding. A consumer, who observed one of the varieties of trade dress that Fresh-way has employed, would be unable to associate one of its other varieties with Freshway, as opposed to one of its competitors. While the presence of Freshway's trademark, and logo, would provide such an association, the Record is uncontested that those designations were removed, once Henry's replaced Freshway as the sponsor of the convenience store display.

Therefore, we conclude, on the totality of the Record presented, that Freshway's asserted trade dress is not distinctive. Such a conclusion entitles Henry's to Summary Judgment on the Plaintiff's trade dress claim. See, *Rainforest Cafe, Inc. v. Amazon, Inc.,* 86 F.Supp.2d 886, 893(D.Minn.1999)("Summary Judgment is appropriate if a plaintiff fails to raise a genuine issue of material fact as to any one of the three elements."), citing *Taj Mahal Enterprises, Ltd. v. Trump,* 745 F.Supp. 240, 252–53 (D.N.J.1990); *Woodsmith Publishing Co. v. Meredith Corp.,* 904 F.2d 1244 (8th Cir.1990). While our analysis could well stop here, in the interest of completeness, we briefly address whether Freshway's asserted trade dress is functional.

b) *Functionality.* Trade dress is nonfunctional if "it is an arbitrary embellishment primarily adopted for purposes of identification and individuality." *Aromatique, Inc. v. Gold Seal, Inc.,* supra at 873; see also, *Insty\*Bit, Inc. v. Poly–Tech Indus., Inc.,* supra at 673. Underlying the functionality concern is the policy behind the Lanham Act, which is to balance the protection of consumers from confusion, against the desired free competition within the market place. See, *Landscape Forms, Inc. v. Columbia Cascade Co.,* supra at 380. Thus, "if the design elements of a trade dress are essential to others attempting to compete in a given business, then the trade dress as a whole is functional and unprotected by the Lanham Act" while, if it "is nonfunctional, a competitor can effectively compete without copying the product's trade dress." *Rainforest Cafe, Inc. v. Amazon, Inc.,* supra at 894. "In assessing functionality, the appropriate inquiry is whether the collection of design elements, taken as a whole, are functional, and not whether individual elements of the trade dress could be categorized as such." *Insty\*Bit, Inc. v. Poly–Tech Indus., Inc.,* supra at 673. The question that we are to ask, as to whether trade dress is functional, is "whether protection of the feature would hinder competition or impinge upon the rights of others to compete effectively in the sale of goods." *Id.*

Overall, the elements of Freshway's trade dress appear functional. Freshway has claimed cooking equipment, counter tops, awnings, menus, sneeze guards, utensils, and uniforms, as part of its trade dress. Similar items have been found to be functional by other Courts. See, *Prufrock Ltd., Inc. v. Lasater,* supra at 133 (finding trade dress including an exposed kitchen area, a large open dining area, and various decorative items, which lent a "country feel" to the restaurants,

was functional); *Rally's Inc. v. International Shortstop, Inc.*, supra (finding trade dress, including the use of the colors red and beige, and backlit outdoor awnings, were functional.).

Likewise, Freshway's claimed trade dress elements, are typical, and necessary, in convenience store food services, and are functional in nature. Clearly, there needs to be counter tops, upon which to prepare, and present a customer's food order, menu boards allow a customer to see what food offerings are available, and sneeze guards protect food, that is exposed to the public, from contamination. Freshway admits that its paper menus were used to permit a customer to order from its counter, while paying for the goods at the gas station register, and to satisfy Freshway's bookkeeping needs, both of which are functional uses.

The appliances, which were needed to heat the customer's food, and the utensils, which were provided to the consumers, are also functional. Likewise the awnings, which are employed to direct customers to the food service areas, are functional in view of the competing areas of a convenience store which could draw the attention of the customer, and which might distract, or frustrate, a potential sale of food goods. While other aspects of Freshway's claimed trade dress were not as obviously functional, those aspects play an inappreciable role in distinguishing Freshway's display, from Henry's. To be sure, the appearance of a uniform, or the use of a "Frequent Buyer Card," has certain nonfunctional uses, as they serve as "arbitrary embellishment[s]

primarily adopted for purposes of identification and individuality," *Aromatique, Inc. v. Gold Seal, Inc.*, supra at 873, but they also adorn employees so as to comply with social mores, and they protect from exposure to workplace dangers, or they promote the sale of products by offering a bonus with increased purchases. On this Record, we cannot conclude that the nonfunctional attributes of the claimed trade dress, overshadow the functional attributes, as they plainly do not.[12] Accordingly, even when viewed in a light most favorable to Freshway, we find that little, if any of its claimed trade dress, rises to nonfunctional importance. Freshway's appearance is almost singularly attributable to the functional needs of selling fast foods in the environs of a convenience store. Were we to conclude that such claimed trade dress were protectible, the market for such food, in such environs, would be entirely occupied by Freshway, to the financial disadvantage of its competitors in the same market. Therefore, we find that Henry's is entitled to Summary Judgment on the trade dress issue.[13]

d. *The Supplemental Jurisdiction Question.* Of necessity, we address Henry's request that, having found that it is entitled to Summary Judgment as to each of the Plaintiff's Federal claims, we should decline to extend supplemental jurisdiction over the remaining two Counts of the Plaintiff's Amended Complaint, which state claims, under Minnesota law, for breach of contract, and conversion, and dismiss those claims, without prejudice.

12. We are not presented with any showing that Henry's adopted the style of uniform that was employed by Freshway, or that Freshway's uniform was stylistically unique—for example, by employing a fictional costume that was associated, thematically, with Freshway. If, as but one illustration, Freshway employees had uniforms designed to depict a cowboy, and Henry's adopted the same type

of costume, then the nonfunctional aspects of the uniform would plainly outweigh the functional, but that did not occur here.

13. We need not reiterate our earlier analysis that *no evidence of customer confusion has* been presented, and we find the prospect of any such confusion to be extremely remote, at best.

Title 28 U.S.C. § 1367(a) provides that District Courts "shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." Where, as here, all of the claims which fall within our original jurisdiction have been dismissed, the Court may decline to exercise supplemental jurisdiction over pendent State law claims. *Title 28 U.S.C. § 1367(c).*

In deciding whether to exercise supplemental jurisdiction, after the dismissal of the only claims arising under its original jurisdiction, the Court is to consider "the stage of the litigation; the difficulty of the state claim; the amount of time and energy necessary for the claim's resolution; and the availability of a state forum." *Minnesota Ass'n of Nurse Anesthetists v. Unity Hosp.,* 5 F.Supp.2d 694, 711 (D.Minn.1998), citing *Marshall v. Green Giant Co.,* 942 F.2d 539, 549 (8th Cir.1991); *Willman v. Heartland Hosp. East,* 34 F.3d 605, 613 (8th Cir.1994), cert. denied, 514 U.S. 1018, 115 S.Ct. 1361, 131 L.Ed.2d 218 (1995). Courts should "exercise judicial restraint and avoid state law issues whenever possible." *Condor Corp. v. City of St. Paul,* 912 F.2d 215, 220 (8th Cir.1990); *Thomas v. Dickel,* 213 F.3d 1023, 1026 (8th Cir.2000), cert. denied, 531 U.S. 1013, 121 S.Ct. 571, 148 L.Ed.2d 489 (2000); *Kansas Public Employees Retirement System v. Reimer & Koger Assoc., Inc.,* 77 F.3d 1063, 1068 (8th Cir.1996), cert. denied, 519 U.S. 948, 117 S.Ct. 359, 136 L.Ed.2d 250 (1996).

Ordinarily, " 'where all federal law claims are eliminated before trial, the balance of factors to be considered' will weigh against the exercise of supplemental jurisdiction." *Edwards v. Widnall,* 17 F.Supp.2d 1038, 1043 (D.Minn.1998), quoting *Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988). Stated otherwise, "[i]f the claim giving original jurisdiction is dismissed early in the action, 'before any substantial preparation has gone into the dependent claims, dismissing or remanding the [state claims] upon declining supplemental jurisdiction seems fair enough.' " *Gregoire v. Class,* 236 F.3d 413, 420 (8th Cir.2000), quoting *Title 28 U.S.C.A. § 1367 comment,* at p. 835 (1993). On the other hand, where the Court has invested "considerable resources" in the action, by the time that the Federal claims are dismissed, the Court would not abuse its discretion in denying a remand. *Grain Land Coop. v. Kar Kim Farms, Inc.,* 199 F.3d 983, 993 (8th Cir.1999).

Here, we find competing factors at play. We are well into this action, and we have invested considerable resources into the matter, in terms of both the Motion for a Preliminary Injunction, and the present Motions. This case is set to be "Ready–for–Trial" on October 1, 2003, and discovery has been closed since December 15, 2002. Clearly, given those considerations, we would not abuse our discretion in declining to dismiss the remaining State law claims. However, we also note that we have not, to this date, undertaken any factual or substantive consideration of the State law claims, which are unrelated to the trademark, and trade dress causes of action that have dominated our consideration of this case.

The breach of contract claim alleges that Henry's failed to pay Freshway a percentage "of all Freshway Order Guide products" that it had sold at Freshway's locations, in accordance with a contract between the parties. Claim Nine alleges that Henry's intentionally took possession of Freshway's proprietary operations, and sales manuals, thereby depriving Freshway of its interest in those manuals. The

issues presented by those claims are unrelated to those that we have previously considered, and appear to be fairly straightforward in nature. Further, Freshway, in its opposition to Henry's Motion for Summary Judgment, offers no objection to our declining to exercise supplemental jurisdiction over those claims, in the event that we ruled in favor of Henry's, and there is no assertion that there would be no forum available to the parties in which to litigate those claims to a resolve.

While we routinely examine issues— both complicated and mundane—of State law, we may defer such matters to the State Courts, under the governing precepts of judicial restraint. See, *Banovetz v. King*, 66 F.Supp.2d 1076, 1088 (D.Minn.1999)("Although the remaining claims are not in areas of unsettled State law, judicial restraint counsels against resolving them where it appears that little of the parties', or the Court's, resources have already been devoted to their merits.").

Therefore, weighing the competing factors, we are persuaded that we should continue to exercise our supplemental jurisdiction over the Plaintiff's remaining State law based claims. To revert the parties to the infancy of a State Court action would do violence to Rule 1, Federal Rules of Civil Procedure, and would be less than a judicious expenditure of scarce judicial resources, whether in the Federal or State Courts. The final resolve of this case will not involve complex, or complicated issues, and the state of readiness for Trial weighs heavily in favor of a retention of our jurisdiction. As a result, we deny Henry's request that Fresh-way's remaining State law claims be dismissed without prejudice.

NOW THEREFORE, It is—

ORDERED:

1. That the Plaintiff's Motion to Compel [Docket No. 52] is GRANTED in part, and DENIED in part, as more fully explained in our oral ruling of February 6, 2003.

2. That the Defendant's Motion to Enforce Settlement [Docket No. 55] is DENIED.

3. That the Defendant's Motion for Partial Summary Judgment [Docket No. 67] is GRANTED.

4. That Counts One through Seven of the Plaintiff's Amended Complaint are dismissed with prejudice.

5. That the Defendant's request that Counts Eight and Nine of the Plaintiff's Amended Complaint be dismissed without prejudice, as an exercise of our supplemental jurisdiction, is DENIED, and those Counts remain for Trial.